Dan Drachler (*pro hac vice* forthcoming)
Sona R. Shah (*pro hac vice* forthcoming)
Henry Avery (*pro hac vice* forthcoming)
ZWERLING, SCHACHTER & ZWERLING, LLP
1904 Third Avenue, Suite 1030
Seattle, WA 98101
Tel: (206) 223-2053
Fax: (206) 343-9636
ddrachler@zsz.com
sshah@zsz.com
havery@zsz.com

Elizabeth J. Cabraser (State Bar No. 083151)
Sarah R. London (State Bar No. 267083)
Eric B. Fastiff (State Bar No. 182260)
Reilly T. Stoler (State Bar No. 310761)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
slondon@lchb.com
efastiff@lchb.com
rstoler@lchb.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **YOURK TRIBE**, | |

**YUROK TRIBE**,

Plaintiff,

vs.

**JUUL LABS, INC.; ALTRIA GROUP, INC.; ALTRIA CLIENT SERVICES LLC; ALTRIA GROUP DISTRIBUTION COMPANY; NU MARK LLC; PHILLIP MORRIS USA INC.; JAMES MONSEES; ADAM BOWEN; NICHOLAS PRITZKER; HOYOUNG HUH; AND RIAZ VALANI**,

Defendants.

MDL Member Case No. ______

MDL Case No. No. 19-md-2913-WHO

Filed Pursuant to Direct Filing Order

The Honorable William H. Orrick

THIS DOCUMENT RELATES TO:
*Yurok Tribe v. JUUL Labs, Inc., et al.*

**COMPLAINT**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1
II. JURISDICTION AND VENUE ........ 3
III. PARTIES ........ 4
  A. The Plaintiff ........ 4
  B. The Defendants ........ 5
IV. FACTUAL ALLEGATIONS ........ 8
  A. The Youth Vaping Epidemic and the Rise of JUUL ........ 8
  B. Big Tobacco and E-Cigarettes ........ 13
  C. JUUL and Altria Join Forces to Protect JUUL's Market Share ........ 18
  D. The Secret to JUUL's Success: Hooking Kids ........ 25
  E. The Cost of JUUL's Success ........ 32
  F. JUUL's Remedial Measures ........ 39
  G. JUUL and the Federal Response ........ 41
  H. JUUL and California's Response ........ 42
  I. JUUL and Indian Tribes ........ 43
  J. Impacts on the Yurok Tribe ........ 45
V. CAUSES OF ACTION ........ 48
  COUNT I – VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *et seq.* ........ 48
  COUNT II – VIOLATION OF CALIFORNIA PUBLIC NUISANCE LAW ........ 57
  COUNT III – NEGLIGENCE ........ 61
VI. REQUEST FOR PUNITIVE DAMAGES ........ 64
VII. PRAYER FOR RELIEF ........ 68
VIII. JURY TRIAL DEMANDED ........ 69

## I. INTRODUCTION

1. The Yurok Tribe, a federally recognized sovereign Indian tribe, brings this action for the wrongful actions and conduct in the marketing and sale of e-cigarettes by Defendants JUUL Labs, Inc. (JUUL); Altria Group, Inc.; Altria Client Services LLC; Altria Group Distribution Company; Nu Mark LLC; Philip Morris USA, Inc. (collectively, the "Altria Defendants"); James Monsees; Adam Bowen; Nicholas Pritzker; Hoyoung Huh; and Riaz Valani.

2. Defendants have knowingly or negligently marketed and promoted JUUL products to the Yurok Tribe and its members and within the Yurok Tribe and geographic areas controlled and occupied by the Yurok Tribe and its members in a manner that foreseeably injured, and continues to gravely injure, the Yurok Tribe and its members by creating an epidemic (the "JUUL epidemic") involving severe medical problems primarily caused by the use of JUUL products.

3. The social and economic costs of the JUUL epidemic brought upon by Defendants are logically and predictably shouldered by governments, including the Yurok Tribe. The Yurok Tribe is responsible for the protection of public health and safety within its jurisdiction, provides essential services to its members, and generates government revenue through economic development. The ability of the Yurok Tribe to carry out these essential functions has been, and continues to be, profoundly threatened by the JUUL epidemic that Defendants' actions have created.

4. While the damage it has caused is widespread, the JUUL epidemic disproportionately impacts American Indian communities and young members of Indian tribes across the United States. The Centers for Disease Control and Prevention (CDC) reported that smoking rates among American Indian and Alaska Natives are the highest in the country compared to all other racial and ethnic groups.[1] The CDC has also reported that more than 20% of American Indian and Alaska Native middle and high school students have used tobacco products, with e-cigarettes the most commonly used product among this group.[2] The effects of

---

[1] Centers for Disease Control & Prevention, *American Indians/Alaska Natives and Tobacco Use*, https://www.cdc.gov/tobacco/disparities/american-indians/index.htm (last visited Aug. 5, 2020).

[2] Satomi Odani et al., *Racial/Ethnic Disparities in Tobacco Product Use Among Middle and High School Students – United States, 2014-2017*, MMWR Morb Mortal Wkly. Rep. (Aug. 31, 2018),

*Footnote continued on next page*

the crisis created by Defendants is exacerbated by numerous factors that are specific to American Indian communities such as the effect of historical trauma, high rates of poverty, deficient health care services, and lack of adequate housing, all of which make tribal communities particularly susceptible to health problems.[3]

5. JUUL has also specifically and deceptively targeted and exploited American Indian communities with its highly addictive and damaging products. It has sought to implement "switching programs" and sales partnerships with numerous tribes by directly seeking to take advantage of a vulnerable American Indian population with its deceptive and misleading sales and marketing practices.[4]

6. Through their actions, Defendants have fueled the JUUL epidemic for their own financial gain, causing Indian tribes across the United States, and the geographic area surrounding the Yurok Tribe in particular, to be flooded with JUUL products, creating an environment where these products and their use and abuse are rampant. Such diversion and abuse were entirely foreseeable results of Defendants' actions in intentionally creating a market for dangerously addictive JUUL products through, in part, concealing the risks of addiction and shipping massive quantities of such products throughout the United States without taking reasonable and necessary steps to prevent diversion and misuse. All of the Defendants in this action thus share responsibility for creating and perpetuating the JUUL epidemic.

7. Defendants have caused foreseeable damages to the Yurok Tribe, including the costs of providing: (1) treatment of nicotine-caused illnesses through its membership and participation in United Indian Health Services and other health programs; (2) prevention and early intervention programs designed to curb the use of JUUL products among its youth and underage members; (3) law enforcement and public safety relating to the use of JUUL products within the Yurok Tribe; and (4) costs of hazardous waste disposal of JUUL products. The Yurok Tribe has

---

*Footnote continued from previous page*
https://www.cdc.gov/mmwr/volumes/67/wr/mm6734a3.htm?s_cid=mm6734a3_w.

[3] Jamie Ducharme, *'It's Insidious': How Juul Pitched E-Cigs to Native American Tribes*, Time (Feb. 6, 2020, 11:38 AM), https://time.com/5778534/juul-native-american-tribes/.

[4] *Id.*

also suffered substantial damages due to the lost productivity of Yurok Tribe members, increased administrative costs, lost opportunities for Yurok Tribe community growth and self-determination, and substantial damages relating to its ability to govern itself, its members, and territory as a direct result of Defendants' acts and omissions. These damages have been suffered and continue to be suffered directly by the Yurok Tribe.

8. The Yurok Tribe brings this action in its own capacity and under its *parens patriae* authority in the public to protect the health, safety, and welfare of its members. The Yurok Tribe is not asserting claims that belong to its individual members nor seeking to recover on behalf of individual members based on individual personal harm. Instead, the Yurok Tribe is seeking damages for harm caused to the Yurok Tribe as a sovereign, including recovery of the funds that it has already expended and must expend in the future to address the conduct described in this Complaint.

9. The Yurok Tribe seeks injunctive relief, abatement, and damages arising out of the injuries to its members, property, and employees caused by Defendants' wrongful conduct in the marketing and sale of its JUUL products.

## II. JURISDICTION AND VENUE

10. The Yurok Tribe brings this action in *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO, and files directly in the U.S. District Court for the Northern District of California as permitted by Amended Case Management Order No. 3, ECF No. 651 (June 8, 2020). In the absence of direct filing, the Yurok Tribe would have filed this Complaint in this same District Court for the Northern District of California.

11. This Court has subject matter jurisdiction over this action because the Yurok Tribe brings a federal cause of action that raises federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Court also has supplemental jurisdiction over the Yurok Tribe's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are part of the same case or controversy.

12. This Court has personal jurisdiction over each Defendant because JUUL is headquartered and does business in the State of California; each Defendant has purposefully availed itself of the privilege of exploiting forum-based business opportunities, including by promoting, marketing, and the sale of the products at issue in this lawsuit; and because the exercise of personal jurisdiction is consistent with Section 410.10 of the California Code of Civil Procedure. This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1964(c).

13. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein arose in this District and Defendants are subject to personal jurisdiction in this District.

## III. PARTIES

### A. The Plaintiff

14. The Yurok Tribe is a federally-recognized sovereign Indian tribe that maintains a government-to-government relationship with the United States, and whose governing body is recognized by the Secretary of the Interior. *See* Indian Entities Recognized by and Eligible to Receive Services From the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5464 (Jan. 30, 2020).

15. The Yurok Tribe's principal business address is 190 Klamath Boulevard, P.O. Box 1027, Klamath, CA, 95548.

16. The Yurok Tribe is the largest federally-recognized tribe within California's borders, with a 56,000-acre reservation located on the lower Klamath River, surrounded by Humboldt and Del Norte Counties in Northern California. The Yurok Tribe has approximately 6,242 members. Tribal members live throughout Humboldt and Del Norte counties and beyond, although the Yurok Reservation is largely represented by two zip codes: 95548 and 95546.

17. The Tribe's ancestral territory extends well beyond the reservation with traditional villages, sacred sites, throughout the surrounding area. Approximately 5,465 members of the Yurok Tribe reside in locations outside of the Yurok Reservation, largely in other areas of Humboldt and Del Norte Counties.

18. The Yurok Tribe is governed by its own Constitution and laws, including a duly elected Tribal Council. The Tribal Council has inherent sovereign governmental authority/responsibility to safeguard and provide for the health, safety, and welfare of Yurok Tribal members as reflected in the Preamble and Article IV, Section 5 of the Constitution of the Yurok Tribe.

19. The Yurok Tribal government provides its members with a variety of governmental services. Regardless of location, many members rely on the Yurok Tribe for their health care, education, social services, law enforcement, and judicial services. Tribal transit service even provides members rides to off-reservation clinics and hospitals as needed for specialized services.

20. The Yurok Health and Human Services Department (YHHS) has the mission of assisting tribal members and families to achieve independence and self-sufficiency in order to achieve healthy, productive communities. YHHS maintains working relationships with Del Norte and Humboldt Counties, including partnerships to address substance abuse.

21. Defendants engaged in activities and conduct that took place on or had a direct impact on land that constitutes Indian Country within the Yurok Tribe's jurisdiction and territory. The design, marketing, and false and misleading statements about Defendants' products into California and onto the Yurok Tribe's lands and surrounding areas created the JUUL epidemic, which resulted in a foreseeable crisis and significant harm to the Yurok Tribe and its members.

22. The Yurok Tribe has inherent sovereignty over unlawful conduct that takes place on, or has a direct impact on, land that constitutes Indian Country within the Yurok Tribe's jurisdiction and territory. Federal law recognizes the Yurok Tribe's authority over its members and territory, specifically the authority to promote the autonomy and the health and welfare of the Yurok Tribe and its members. The Yurok Tribe has standing to recover damages incurred as a result of Defendants' actions and omissions.

**B. <u>The Defendants</u>**

23. Defendant JUUL is a Delaware corporation having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017,

PAX Labs, Inc. was renamed JUUL Labs, Inc. JUUL manufactures, designs, sells, markets, promotes, and distributes JUUL e-cigarettes, JUULpods, and accessories throughout California and the Yurok Tribe's land that constitutes Indian Country within the Yurok Tribe's territory.

24. Defendant Altria Group, Inc. is a Virginia corporation having its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers and marketers of tobacco products. On December 20, 2018, Altria purchased a 35% stake in JUUL.

25. Defendant Altria Client Services LLC is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Henrico County, Virginia. Altria Client Services LLC provides Altria Group, Inc. and its companies with services in many areas including digital marketing; packaging design & innovation; product development; and safety, health, and environmental affairs. On September 25, 2019, the former senior vice president and chief growth officer of Altria Client Services LLC, K.C. Crosthwaite, became the new chief executive of JUUL.

26. Defendant Altria Group Distribution Company is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Henrico County, Virginia. Altria Group Distribution Company provides sales, distribution, and consumer engagement services to Altria's tobacco companies.

27. Defendant Nu Mark LLC is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Richmond, Virginia. Nu Mark LLC was engaged in the manufacture and sale of Altria's electronic vapor products. Shortly before Altria purchased a 35% stake in JUUL in December 2018, Altria Group, Inc. announced that Nu Mark LLC would be discontinuing the production and sale of all e-vapor products.

28. Defendant, Philip Morris USA, Inc. ("Philip Morris"), is a wholly owned subsidiary of Altria. Philip Morris is also a Virginia corporation that has its principal place of business in Richmond, Virginia. Philip Morris is engaged in the manufacture and sale of cigarettes in the United States. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years.

29. Defendant James Monsees is a resident of the San Francisco Bay area, California. He served as Chief Executive Officer of Juul until October 2015. Since October 2015, he has been Chief Product Officer of Juul. At all relevant times, he has been a member of the Board of Directors of Juul, until stepping down in March 2020.

30. Defendant Adam Bowen is a resident of the San Francisco Bay area, California. At all relevant times, he has been Chief Technology Officer and a member of the Board of Directors of Juul.

31. Defendant Nicholas Pritzker is a resident of San Francisco, California, and a member of the Pritzker family, which owned the chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Pritzker received a J.D. from the University of Chicago. In 2007, he invested in Juul.[5] He has been on the Board of Directors of Juul since at least June 2014. At least from October 2015 to August 2016, he was on the Executive Committee of the Board of Directors. As of November 2017, he controlled two Board seats (the second of which was occupied by Hoyoung Huh).

32. Defendant Hoyoung Huh lives and works in the Silicon Valley area, California. He holds an M.D. from Cornell and a Ph.D. in Genetics/Cell Biology from Cornell/Sloan-Kettering. He has been CEO or a Board member of numerous biotechnology businesses, including Geron Corporation. Huh has been on the Board of Directors of Juul since at least June 2015. At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors. As of November 2017, he served as Pritzker's second seat on the Juul Board.

33. Defendant Riaz Valani lives near San Jose, California and is a general partner at Global Asset Capital, a San Francisco-based private equity investment firm. He has been on the Board of Directors of Juul since at least May 2011.[6] At least from October 2015 to August 2016,

---

[5] Ainsley Harris, *How JUUL went from a Stanford thesis to $16 billion startup*, Fast Co. (Mar. 8, 2020), https://www.fastcompany.com/90263212/how-JUUL-went-from-a-stanford-thesis-to-16-billion-startup.

[6] Ploom, Inc., Notice of Exempt Offering of Securities (Form D) (May 5, 2011), https://www.sec.gov/Archives/edgar/data/1520049/000152004911000001/xslFormDX01/primary_doc.xml.

he was on the Executive Committee of the Board of Directors. As of November 2017, he controlled two Juul Board seats, the second of which was occupied by Zach Frankel.

## IV. FACTUAL ALLEGATIONS

### A. The Youth Vaping Epidemic and the Rise of JUUL

34. One of the great public health success stories over the past decade has been a reduction in youth tobacco use and nicotine addiction. Youth smoking rates plummeted from 28% in 2000 to 7.6% in 2017.[7] This success has been the result of years of litigation and strict regulation. It is also due to the widespread and mainstream public health message that smoking kills people—a message that the tobacco industry can no longer dispute or contradict.

35. This incredible progress towards eliminating youth tobacco and nicotine use has now largely been reversed due to the growing prevalence of e-cigarettes and vaping products. Between 2011 and 2015, e-cigarette use among high school and middle school students increased 900%.[8] Between 2017 and 2018, e-cigarette use increased 78% among high school students, from 11.7% of high school students in 2017 to 20.8% of high school students in 2018.[9] Among middle school students, e-cigarette use increased 48% between 2017 and 2018.[10] In 2018, 4.9 million middle and high school students used tobacco products, with 3.6 million using e-cigarettes.[11] Between 2017 and 2018, the number of youth e-cigarette users increased by 1.5 million.[12]

---

[7] *Examining JUUL's Role in the Youth Nicotine Epidemic: Part I, Hearing Before the Subcomm. on Econ. and Consumer Policy of the H. Comm. on Oversight and Reform*, 116th Cong. (2019) (statement of Meredith Berkman, Parents Against Vaping E-cigarettes), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Berkman-PAVe%20Testimony.pdf.

[8] Jerome Adams, *Surgeon General's Advisory on E-cigarette Use Among Youth*, Ctrs. for Disease Control & Prevention (2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[9] *Id.*

[10] *2018 NYTS Data: A startling rise in youth e-cigarette use*, U.S. Food & Drug Admin., https://www.fda.gov/tobacco-products/youth-and-tobacco/2018-nyts-data-startling-rise-youth-e-cigarette-use (last updated May 4, 2020).

[11] *Id.*

[12] Ctrs. for Disease Control and Prevention, *Tobacco Use By Youth Is Rising: E-Cigarettes are the Main Reason* (Feb. 2019), https://www.cdc.gov/vitalsigns/youth-tobacco-use/index.html.

36. In 2019, an estimated 27.5% of high school students and 10.5% of middle school students reported current e-cigarette use. Among current e-cigarette users, an estimated 34.2% of high school students and 18% of middle school students reported frequent use. An estimated 21.4% of current e-cigarette users in high school and 8.8% of users in middle school reported daily e-cigarette use.[13]

37. According to the CDC Director Robert Redfield, "[t]he skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing youth tobacco use. It's putting a new generation at risk for nicotine addiction."[14] The U.S. Food and Drug Administration (FDA) Commissioner Scott Gottlieb described the above statistics as "astonishing," and both the FDA and the U.S. Surgeon General have appropriately characterized youth vaping as an "epidemic."[15] The National Institute on Drug Abuse found that the 2018 spike in nicotine vaping was the largest for any substance recorded in 44 years, and Alex Azar, Secretary of the U.S. Department of Health and Human Services, declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[16]

38. Teenage vaping is rampant within the Yurok Tribe's reservation and jurisdiction, as well as in California. The many harms of vaping and e-cigarettes are compounded by the current COVID-19 pandemic in the United States. Teenagers that use e-cigarettes and vaping

---

[13] Cullen, Ph.D., Gentzke, Ph.D., et al., "e-Cigarette Use Among Youth in the United States, 2019", *JAMA* (Nov. 5, 2019); https://jamanetwork.com/journals/jama/fullarticle/2755265 (last visited Aug. 5, 2020).

[14] *Texas governor signs law increasing the age to buy tobacco products to 21*, CNN (June 8, 2019, 9:50 PM), https://m.cnn.com/en/article/h_b4cf0b92fd821251a4ae48df9b717145.

[15] Angelica LaVito, *FDA chief Gottlieb threatens to pull e-cigarettes off market if 'astonishing' surge in teen use doesn't slow*, CNBC (Nov. 16, 2018, 8:16 AM), https://www.cnbc.com/2018/11/16/fda-chief-gottlieb-threatens-to-pull-e-cigarettes-off-market.html; Jayne O'Donnell, *FDA declares youth vaping an epidemic, announces investigation, new enforcement*, USA Today (Sept. 12, 2018), https://www.usatoday.com/story/news/politics/2018/09/12/fda-%20scott-gottlieb-youth-vaping-e-cigarettes-epidemic-enforcement/1266923002/ (last updated Sept. 23, 2018).

[16] Jan Hoffman, *Study Shows Big Rise in Teen Vaping This Year*, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, *Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up*, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit.

products are much more susceptible to, and impacted by, the Coronavirus than other teenagers due to vaping damage to the lungs of these teenagers. "'Young adults and teens who vape will not only be at increased risk for COVID-19 infection, but intensity of presentation will be worse. . . . Vaping causes interstitial lung disease and is additive to any toxicity from the virus. This is already reflected by the higher mortality in VZV Pneumonitis, encountered in smokers.'"[17]

39. A major cause of the vaping epidemic and its consequences to teenagers are the activities of JUUL Labs, Inc., the maker of the JUUL e-cigarette. JUUL entered the e-cigarette market in 2015 and controls a substantial majority of that market, as high as 76%.[18] Over a million JUUL e-cigarettes were sold between 2015 and 2017.[19] JUUL products are available at over 12,000 retail stores and online.[20] In 2017, JUUL generated over $224 million in retail sales, a 621% year-over-year increase.[21] By June 2018, sales had skyrocketed another 783%, reaching $942.6 million.[22] The e-cigarette category as a whole grew 97% to $1.96 billion in the same period, largely based on JUUL's market success.[23] JUUL's dominance of the e-cigarette market has been so rapid and so complete that the act of vaping is now referred to as "JUULing."

40. JUUL's market dominance has attracted the attention and alarm of government regulators, including the FDA, the U.S. Surgeon General, and the CDC. On April 24, 2018, the FDA sent a letter to JUUL expressing concern about the popularity of its products among youth

---

[17] Dave Campbell, *M.D.*, *Vaping: One of the Best Ways to Trash Your Lungs and Maybe Die if You Catch Coronavirus*, MSNBC (March 21, 2020, 1:45 PM), http://www.msnbc.com/morning-joe/vaping-one-the-best-ways-trash-your-lungs-and-maybe-die-if-you-catch-coronavirus (last updated Mar. 21, 2020).

[18] Richard Craver, *Juul ends 2018 with 76 percent market share*, Winston-Salem Journal (Jan. 8, 2019), https://www.journalnow.com/business/juul-ends-2018-with-76-percent-market-share/article_6f50f427-19ec-50be-8b0c-d3df18d08759.html#:~:text=Juul%20Labs%20Inc.'s%20dominance,maker%20as%20a%20majo r%20investor.

[19] Melia Robinson, *How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year*, Bus. Insider (Nov. 21, 2017), https://www.businessinsider.sg/juul-e-cigarette-one-million-units-sold-2017-11.

[20] *Id.*

[21] *Id.*

[22] Angelica LaVito, *Popular e-cigarette Juul's sales have surged almost 800 percent over the past year*, CNBC Health & Sci., (July 2, 2018, 2:33 PM), https://www.cnbc.com/2018/07/02/juul-e-cigarette-sales-have-surged-over-the-past-year.html (last updated Sept. 11, 2018).

[23] *Id.*

and demanding that JUUL produce documents regarding its marketing practices.[24] On September 12, 2018, the FDA sent letters to JUUL and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.[25] In September 2018, the FDA raided JUUL's headquarters and seized more than a thousand documents relating to the company's sales and marketing practices.[26] As of October 2019, the FDA, the Federal Trade Commission, multiple state attorneys general, and the U.S. House of Representatives Committee on Oversight and Reform had all commenced investigations into JUUL's role in the youth vaping epidemic and whether JUUL's marketing practices purposefully targeted youth.

41. The decline of cigarette use and the rise of JUUL is far from a coincidence. The company was founded by Adam Bowen and James Monsees, both product designers by education and experience. Bowen and Monsees met in Stanford University's famed graduate product design program, where the first iteration of JUUL was their final project.[27] Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[28]

42. Years of litigation, regulation, and education by public health advocates, the medical community, and elected officials against the tobacco industry had severely tarnished the popularity of cigarettes. Monsees and Bowen thus set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[29] Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco

---

[24] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. Food & Drug Admin. (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

[25] Scott Gottlieb, *Letter from Commissioner of Food and Drugs to Kevin Burns at JUUL Labs, Inc.*, U.S. Food & Drug Admin. (Sept. 12, 2018), https://www.fda.gov/media/119669/download.

[26] Laurie McGinley, *FDA seizes Juul e-cigarette documents in surprise inspection of headquarters*, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documents-surprise-inspection-headquarters/.

[27] Julia Belluz, *The Vape Company Juul Said It Doesn't Target Teens. Its Early Ads Tell a Different Story*, Vox (Jan. 25, 2019, 9:10 AM), https://www.vox.com/2019/1/25/18194953 /vape-juul-e-cigarette-marketing.

[28] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (last visited Aug. 5, 2020).

[29] *Onboardly Interview with Ploom Cofounder and CEO James Monsees*, Pax.com (Apr. 30, 2014), https://web.archive.org/web/20160307151834/http://onboardly.com/entrepreneur-interviews/an-interview-with-james-monsees/.

products."[30] Seeking to recreate the lost "ritual and elegance that smoking once exemplified," Monsees set out to re-design the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with— cigarettes."[31] In essence, the objective of JUUL was to build a newer, more attractive cigarette—one that could deliver nicotine and addict a new generation of smokers. By design, a cornerstone of the product's commercial success is its addictive nature that compels those who use these products to keep buying and using them.

43. JUUL, in many ways, has all the markings of Silicon Valley success: staggering profit margins, meteoric growth, and status as a cultural phenomenon. This Silicon Valley-savvy company used the framework and ideology of startup culture to catapult itself to success by every metric in the startup industry. In 2018, JUUL's gross profit margins were 70%[32] and it represented 76.1% of the national e-cigarette market.[33] It shattered previous records for reaching decacorn status by reaching valuation of over $10 billion in a matter of months, or four times faster than Facebook.[34] This all came just three years after its product launch.

44. JUUL's staggering commercial success did not come from a blank slate. Under the Master Settlement Agreement between Big Tobacco and the States, the public has access to hundreds of thousands of Big Tobacco's internal documents. In creating JUUL, Monsees and Bowen carefully studied the marketing strategies, advertisements, and product design of Big Tobacco. As Monsees candidly acknowledged, the internal tobacco documents "became a very intriguing space for us to investigate because we had so much information that you wouldn't

---

[30] *Id.*

[31] *Id.*

[32] Dan Primack, *Scoop: The Numbers Behind Juul's Investor Appeal*, Axios (July 2, 2018), https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee-5da64e3e2f82.html.

[33] Robert K. Jackler, et al., *JUUL Advertising Over Its First Three Years on the Market 2*, Stanford Research into the Impact of Tobacco Advertising (2019) ("JUUL Advertising"), https://www.wbtw.com/wp-content/uploads/sites/22/2019/09/JUUL_Marketing_Stanford.pdf.

[34] Zack Guzman, *Juul Surpasses Facebook As Fastest Startup to Reach Decacorn Status*, Yahoo! Finance (Oct. 9, 2019), https://finance.yahoo.com/news/juul-surpasses-facebook-fastest-startup-reach-decacorn-status-153728892.html#:~:text=It's%20the%20ubiquity%20of%20the,startup%20in%20history%20%E2%80%93%20including%20Facebook.&text=E%2DCigarette%20maker%20Juul%20Labs,done%20in%20such%20little%20time.

normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[35]

45. Some of the Big Tobacco records that Monsees and Bowen reviewed showed documents on how to manipulate nicotine pH to maximize nicotine delivery in a vapor while minimizing the "throat hit" that may potentially deter new smokers. Other records relate to tobacco industry market strategies and advertisements designed to lure non-smoking youth. Monsees and Bowen were able to take advantage of an extensive online tobacco advertising research database maintained by the Stanford Research into the Impact of Tobacco Advertising (SRITA), an inter-disciplinary research group devoted to researching the promotional activities of the tobacco industry. SRITA's database contains approximately 50,000 original tobacco advertisements. According to Monsees, JUUL's advertising was informed by traditional tobacco advertisements, and SRITA in particular had been very useful to JUUL.[36]

46. Put simply, the marketing and product design of the JUUL e-cigarette, and its incredible commercial success, are based upon tactics and strategies originally developed by Big Tobacco. As set forth below, while Big Tobacco was prohibited from employing these tactics and strategies to market traditional cigarettes by virtue of the Master Settlement Agreement and subsequent regulations, nothing in that settlement prevented JUUL from doing so.

### B. <u>Big Tobacco and E-Cigarettes</u>

47. While JUUL revolutionized and dominated the e-cigarette market, it did not create the first one. Prior to JUUL, Big Tobacco—including Altria—was also heavily involved in the manufacture and promotion of e-cigarettes. Altria has been one of the biggest losers in the fight against smoking. Altria estimates that the cigarette industry declined by -4% in 2017 and by -4.5% in 2018. For 2019 through 2023, Altria estimated the average annual U.S. cigarette industry volume decline is (or would be) -4% to -5%.[37] Altria later revised this estimate in the second quarter of 2019 to 4-6% in light of efforts to increase the legal age for cigarette smoking to 21.[38]

---

[35] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (last visited Aug. 5, 2020).

[36] JUUL Advertising at 27.

[37] *Presentation for Altria's Fourth-Quarter 2018 Earnings Conference Call*, Altria, at p. 6 (Jan.

*Footnote continued on next page*

48. In the face of these declining profits, Altria turned to e-cigarettes along with other "non-combustible products" to "enhance" its business platform.[39] Altria boasted to shareholders that it "aspire[d] to be the U.S. leader in authorized, non-combustible, reduced-risk products."[40]

49. In early 2014, Altria entered the e-cigarette market with its own e-cigarette product sold under the brand MarkTen.[41] Following a phased roll-out of MarkTen in Indiana and Arizona in late 2013, Altria launched the MarkTen nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for Imperial Tobacco's e-vapor product, blu.[42]

50. E-cigarette advertising spending for 2014 totaled $88.1 million, a 52% increase from 2013.[43] Of that $88.1 million spent in 2014, nearly 40% was Altria's MarkTen campaign, at $35 million.[44]

51. Altria's MarkTen advertising tag line, "Let It Glow," was criticized by public health advocates for playing off Disney's popular children's movie "Frozen" and its hit song "Let it Go."[45]

---

*Footnote continued from previous page*
31, 2019), http://investor.altria.com/Cache/IRCache/3ec9cf77-9d83-04fe-1ea2-1e2b8437afa5.PDF?O=PDF&T=&Y=&D=&FID=3ec9cf77-9d83-04fe-1ea2-1e2b8437afa5&iid=4087349.

[38] *Altria Shares Slide As Cigarette Sales Continue to Decline*, Tobacco Business (July 31, 2019), https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.

[39] *Presentation for Altria's Second-Quarter 2019 Earnings Conference Call*, Altria, at p.24 (July 30, 2019), http://investor.altria.com/Cache/IRCache/cbf69f8f-c60c-52e3-0a5c-c9c76833c670.PDF?O=PDF&T=&Y=&D=&FID=cbf69f8f-c60c-52e3-0a5c-c9c76833c670&iid=4087349.

[40] *Presentation for Annual Meeting of Shareholders*, Altria, at p. 11 (May 17, 2018), http://investor.altria.com/Cache/IRCache/2ead25b7-a790-f74f-51a6-4c5e2194d3b2.PDF?O=PDF&T=&Y=&D=&FID=2ead25b7-a790-f74f-51a6-4c5e2194d3b2&iid=4087349.

[41] Jennifer Cantrell et al., *Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace*, Tobacco Control, Vol. 25, e16 (2016), https://pubmed.ncbi.nlm.nih.gov/26530219/.

[42] *Id.*; John Reid Blackwell, *Decision to expand e-cigarette sales and acquire Green Smoke may indicate more optimism about 'e-vapor' category*, Richmond Times-Dispatch (Feb. 20, 2014), https://www.richmond.com/markten-to-roll-out-in-2q/articlef1dcaa85-ccdf-577b-8b48-d1e05c0cf14b.html.

[43] Jennifer Cantrell et al., *Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace*, Tobacco Control, Vol. 25, e16 (2016), https://pubmed.ncbi.nlm.nih.gov/26530219/.

[44] *Id.*

[45] Matt Richtel, *A Bolder Effort by Big Tobacco on E-Cigarettes*, N.Y. Times (June 17, 2014), https://www.nytimes.com/2014/06/17/business/a-bolder-effort-by-big-tobacco-on-e-cigarettes.html.

52. Even the then-president of R.J. Reynolds Vapor Company, Stephanie Cordisco, criticized Altria for irresponsible marketing, calling this tag line "terrible" and saying that the companies "running the most irresponsible campaigns are the ones who know better."[46] At the time, the president of the Campaign for Tobacco-Free Kids said that companies like Altria were using "exactly the same themes we saw work with kids in the U.S. for decades with cigarettes."[47]

53. Although free samples of tobacco products are prohibited under the terms of the Tobacco MSA as well as FDA regulations issued in 2010, Altria took advantage of the grey area in the regulation of e-cigarettes and distributed coupons for free sample nicotine cartridges as part of its MarkTen launch. (The FDA has since issued finalized guidance clarifying the scope of the ban on distributing free samples or coupons for e-cigarettes or components, and it has now banned such distribution).

54. Altria also took full advantage of its distribution network, reaching 60,000 stores in a month.[48] In Arizona, for example, Altria's distribution network allowed MarkTen to achieve a 48% e-cigarette market share in just seven weeks after launch, according to then-CEO Marty Barrington's statements on an earnings call.[49] Altria was clear in its intent to dominate the e-cigarette market as it has the traditional cigarette one: "We are the market leader today and we will continue to be," Barrington told investors.[50]

55. Altria began acquiring small companies in the vaping industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were designed as "battery-powered devices that turn nicotine-laced liquid into vapor."[51] In 2017, Altria acquired a vaping product called Cync, from

---

[46] *Id.*

[47] *Id.*

[48] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[49] Mike Esterl, *Altria To Launch MarkTen E-Cigarette Nationally*, Wall Street Journal (Feb. 19, 2014, 12:57 PM), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378.

[50] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[51] Mike Esterl, *Altria To Launch MarkTen E-Cigarette Nationally*, Wall Street J. (Feb. 19, 2014, 12:57 PM), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378.

Vape Forward. Cync is a small vapor device that uses prefilled pods similar to the ones offered by JUUL. It also made a minority investment in Avail Vapor, one of the largest vape store chains in the U.S., which also produces and sells its own branded e-liquids for so-called open-system devices, which are refillable.[52]

56. In February 2018, Altria announced that it would enter the closed-tank market with the MarkTen Elite: "a pod-based product with a premium, sleek battery design" and having the "convenience of pre-filled, magnetic click pods." At an analyst conference in February 2018, former Altria chief Marty Barrington boasted that the Elite's pods held more than twice as much liquid as JUUL's.[53]

57. Altria quickly followed with another pod-based product: the Apex by MarkTen.

58. Because e-cigarettes are subject to more relaxed regulation than cigarettes, Altria was able to market its products in ways it could not have done for traditional tobacco products. Altria marketed its e-cigarettes in flavors that would appeal to youth: Strawberry Brulee, Apple Cider, Hazelnut Cream, Spiced Fruit, Piña Colada, Glacier Mint, and Mardi Gras (apparently a mixed berry flavor). Most of these flavors were marketed with the Elite and Apex products, Altria's "pod" e-cigarettes.

59. Altria's push to gain the youth market gained the attention of the FDA. On September 12, 2018, the FDA sent a warning letter to Altria, requesting that Altria respond with a "detailed plan" to address and mitigate the widespread use of its e-cigarette products by minors.[54] Due to the "epidemic rate of increase in youth use" of e-cigarettes, the FDA had recently conducted an "enforcement blitz" of retailers nationwide and confirmed that Altria's MarkTen products were often being sold to minors.[55] The FDA did not mince words, telling Altria that

---

[52] Timothy S. Donahue, *At the Forefront*, Tobacco Rep. (Dec. 1, 2017), https://www.tobaccoreporter.com/2017/12/at-the-forefront/.

[53] Marty Barrington, *Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, Chief Executive Officer (CEO) and President, and other members of Altria's senior management team*, US SEC (Feb. 21, 2018), https://www.sec.gov/Archives/edgar/data/764180/000076418018000020/exhibit992-2018cagnyremarks.htm.

[54] Scott Gottlieb, *Letter to Altria Client Services*, U.S. Food and Drug Admin. (Sept. 12, 2018), https://www.fda.gov/media/119666/download.

[55] *Id.*

"[t]his is unacceptable, both legally and as a matter of public health."[56] The FDA warned Altria that it has a responsibility to ensure minors are not getting access to its products and that it was "crucial" that manufacturers like Altria take steps to prevent youth from using its products.[57] First and foremost, the FDA asked Altria to "take prompt action to address the rate of youth use of MarkTen products." The FDA suggested that Altria could revise its current marketing practices, eliminate online sales, and remove flavored products from the market. The FDA's expectation and motivation were clear: "steps must be taken to protect the nation's young people."[58]

60. On October 25, 2018, Altria responded to the FDA, claiming to have "serious concerns" about youth access to e-vapor products.[59] It admitted that the use of e-cigarettes by youth had risen to "epidemic levels."[60] In response, Altria agreed to remove its pod-based e-cigarettes from the market and stop selling any flavored traditional e-cigarettes other than tobacco, menthol, and mint.[61] It acknowledged that "[b]ased on publicly-available information from FDA and others, we believe pod-based products significantly contribute to the rise in youth use of e-vapor products. Although we do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue."[62] Altria's letter went on to disclaim a number of practices that it associated with marketing to youth that were key components of JUUL's marketing strategy. Altria specifically identified the use of flavors that go beyond traditional tobacco flavors, digitally advertising on websites with a large percentage of youth visitors, using social media to promote the brand, allowing online purchases and promotional sign-ups without age verification, advertising e-cigarettes on billboards, advertising with models who appear to be under 25 years old, distributing branded merchandise,

---

[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] Howard A. Willard, *Letter to Scott Gottlieb, Commissioner*, Altria (Oct. 25, 2018), https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/Altria-Response-to-FDA-E-vapor-October-25-2018.pdf.
[60] *Id.*
[61] *Id.*
[62] *Id.*

and paying celebrities or other third parties to market or use a particular brand's e-cigarette.[63] Altria also claimed to support "banning vaping in schools" in order to reduce "social access." Altria ended the letter by committing to "reverse the current use trend among youth."[64]

61. Less than two months later, Altria changed its tune. On December 20, 2018, Altria announced that it would be making a $12.8 billion dollar investment in JUUL, the biggest equity investment in United States history.[65] The deal gave Altria a 35% stake in JUUL.

### C. <u>JUUL and Altria Join Forces to Protect JUUL's Market Share</u>

62. By the fall of 2018, JUUL was under intense scrutiny. A group of eleven United States senators wrote JUUL's CEO, Kevin Burns, a letter in April 2018, declaring that the JUUL device and JUULpods "are undermining our nation's efforts to reduce tobacco use among youth and putting an entire new generation of children at risk of nicotine addiction and other health consequences."[66] Less than a week later, then-FDA Commissioner Gottlieb announced a crackdown on retailers to limit youth access to e-cigarettes and enforcement actions against JUUL in particular.[67] At the same time, the FDA sent JUUL a request for documents relating to marketing, product design, and public health impact.[68] In July 2018, Massachusetts Attorney General Maura Healey announced an investigation into JUUL regarding marketing and sale to minors.[69] In September 2018, FDA Commissioner Gottlieb called youth vaping an "epidemic"

---

[63] *Id.*

[64] *Id.*

[65] Cromwell Schubarth, *Vaping Unicorn Juul Opens Lab in Mountain View Amid Furor in S.F.*, Silicon Valley Bus. J. (Feb. 5, 2019), https://www.bizjournals.com/sanjose/news/2019/02/05/juul-opens-lab-in-mountain-view.html.

[66] Richard Durbin et al., *Letter from 11 U.S. Senators, to Kevin Burns, CEO of JUUL Labs, Inc.*, United States Senate (Apr. 18, 2018), https://www.durbin.senate.gov/imo/media/doc/JUUL%20Letter%20-%20S%20IGNED.pdf.

[67] Scott Gottlieb, *Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes* (April 23, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-enforcement-actions-and-youth-tobacco-prevention.

[68] *Id.*

[69] Press Release, Office of Attorney General Maura Healey, AG Healey Announces Investigation into JUUL, Other Online E-Cigarette Retailers Over Marketing and Sale to Minors (July 24, 2018), https://www.mass.gov/news/ag-healey-announces-investigation-into-juul-other-online-e-cigarette-retailers-over-marketing.

and sent letters to JUUL, Altria, and other e-cigarette manufacturers demanding a plan to reduce youth use.[70] Then, in September 2018, as alleged above, the FDA raided JUUL's headquarters and seized more than a thousand documents relating to JUUL's sales and marketing practices.[71]

63. On November 13, 2018, JUUL responded with an "Action Plan," declaring its intent to stop selling certain flavors in brick-and-mortar stores, restrict purchases of those flavors on the JUUL website to adults age 21 and over, and shut down its social media accounts.[72]

64. As the pressure on JUUL intensified, Altria stepped in to assist. Despite the clear criticism of JUUL's conduct in its October 25th letter to the FDA, Altria announced its $12.8 billion investment in JUUL on December 20, 2018.[73] Altria characterized its investment as one intended to "accelerate harm reduction and drive growth."[74] In an investor presentation in 2019, Altria described JUUL as having a "unique" and "compelling" product.[75]

65. But as the president of the Campaign for Tobacco-Free Kids observed upon announcement of the deal, "Altria has no interest in seriously reducing the number of people who smoke cigarettes."[76]

66. Altria would not have made such an investment if it did not intend to grow JUUL's already enormous market even more. This is confirmed by Altria's statement when announcing its investment, explaining that its investment in JUUL "enhances future growth prospects" and

---

[70] *See* CTP Letters to Industry, https://www.fda.gov/tobacco-products/rules-regulations-and-guidance/ctp-letters-industry#youth-access.

[71] Laurie McGinley, *FDA seizes Juul e-cigarette documents in surprise inspection of headquarters*, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documents-surprise-inspection-headquarters/.

[72] Juul Labs Action Plan, *Message From Kevin Burns, CEO, Juul Labs* (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/.

[73] *Atria Makes $12.8 Billion Minority Investment in Juul to Accelerate Harm Reduction and Drive Growth*, Business Wire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL- Accelerate.

[74] *Id.*

[75] Howard Willard, *Remarks of Chairman and CEO at 2019 CAGNY Investor Presentation*, Altria (Feb. 20, 2019), Altria Group, Inc., http://investor.altria.com/Cache/IRCache/5847584a-8e53-e0a3-f166-7d5bc7bfe495.PDF?O=PDF&T=&Y=&D=&FID=5847584a-8e53-e0a3-f166-7d5bc7bfe495&iid=4087349.

[76] Shiela Kaplan & Matt Richtel, *Juul Closes Deal with Tobacco Giant Altria*, N.Y. Times (Dec. 20, 2018), https://www.nytimes.com/2018/12/20/health/juul-reaches-deal-with-tobacco-giant-altria.html.

committing to applying "its logistics and distribution experience to help JUUL expand its reach and efficiency[.]"[77] Since the deal was inked in December 2018, Altria's actions have clearly helped JUUL maintain, if not expand, its market share—a market share that, based on Altria's own October 25, 2018 letter to the FDA, it believes was gained by employing marketing and advertising practices that contributed to youth vaping. Altria's Second Quarter 2019 Earnings Call reported that JUUL continued to grow in the first half of 2019, from a 33% category share in 2018 to 48% by the second quarter 2019. JUUL's expected revenue for 2019 is $3.4 billion, nearly triple what it was in 2018.[78]

67. From JUUL's beginnings, Altria had "followed JUUL's journey rather closely."[79] Altria Chairman and CEO Howard Willard said that, for years, his company "watched JUUL carefully to see if it had staying power."[80] Altria decided it did. As Willard explained: "During 2018, we concluded that JUUL had not only become the retail share leader in the U.S. e-vapor category, but that no other brand was close to it in share or future growth potential."[81] This was enough for Altria, one of the world's largest producers and marketers of tobacco products, to call JUUL's alleged smoking cessation device a "terrific product" and take a 35% stake in the company with its $12.8 billion investment.[82] With this investment, Altria now owns both the number one youth initiation cigarette in the United States (the Marlboro cigarette) and the number one youth initiation e-cigarette in the United States, JUUL.

---

[77] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL- Accelerate.

[78] Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.

[79] Howard Willard, *Remarks of Chairman and CEO at 2019 CAGNY Investor Presentation*,, Altria (Feb. 20, 2019), Altria Group, Inc., http://investor.altria.com/Cache/IRCache/5847584a-8e53-e0a3-f166-7d5bc7bfe495.PDF?O=PDF&T=&Y=&D=&FID=5847584a-8e53-e0a3-f166-7d5bc7bfe495&iid=4087349 at 4.

[80] *Id.*

[81] *Id.*

[82] *Id.*

68. Notwithstanding Altria's statements to the FDA just two months previously about its concerns that JUUL was marketing and advertising its products in a way that contributed to the youth vaping epidemic, Willard stated that the deal would allow Altria to "work[] with JUUL to accelerate its mission."[83] Altria committed to applying "its logistics and distribution experience to help JUUL expand its reach and efficiency" and to offering JUUL the support of "Altria's sales organization, which covers approximately 230,000 retail locations."[84] It also gave JUUL access to its "premier" retail shelf space while allowing it to continue to sell its flavored products online and provided JUUL with access to the databases of all of Altria's companies. According to Willard, Altria was "excited to support JUUL's highly-talented team and offer [Altria's] best-in-class services to build on their tremendous success."[85] Altria admitted that minors were using JUUL products and that "underage use of e-cigarette product is a problem."[86] Nevertheless, it stated that it believed its investment in JUUL "strengthens its financial profile and enhances future growth prospects."[87]

69. Altria's decision to prioritize profits without regard to the dangers of youth vaping did not go unnoticed. On February 6, 2019, then-FDA Commissioner Scott Gottlieb, sent Altria another letter "regarding representations" made by Altria acknowledging that it "has an obligation to take action to help address the mounting epidemic of youth addiction to tobacco products."[88] Commissioner Gottlieb told Altria that its recent purchase of a 35% ownership of JUUL "contradict[s] the commitments you made to the FDA." The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Commissioner Gottlieb told Altria that "deeply concerning data" shows that

---

[83] *Id.*

[84] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL- Accelerate.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] Scott Gottlieb, *Letter to Howard Willard*, U.S. Food and Drug Admin. (Feb. 6, 2019), https://www.fda.gov/media/122589/download.

"youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."[89]

70. The companies met with Gottlieb in March 2019 in a meeting the Commissioner described as "difficult." Gottlieb "did not come away with any evidence that public health concerns drove Altria's decision to invest in JUUL, and instead sa[id] it looks like a business decision."[90] Just a few weeks later, Gottlieb resigned his position.

71. As mentioned above, Altria's investment in JUUL is not only a financial contribution. Altria is working to actively help run JUUL's operations and expand JUUL's sales. Altria's investment brings legal and regulatory benefits to JUUL, by assisting with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure. Altria also brings lobbying muscle. In addition, Altria's arrangement with JUUL gives JUUL greater access to retail. JUUL has been in 90,000 U.S. retail outlets, while Altria reaches 230,000 U.S. outlets. Altria brings its logistic and distribution experience. Importantly, Altria gives JUUL access to shelf space—and not just shelf space, but space near Altria products and retail displays. The arrangement allows JUUL's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

72. Altria is closely intertwined with JUUL. Not only does Altria's investment also allow it to appoint a third of JUUL's board, but in September 2019, JUUL's CEO resigned to be replaced by a career Altria executive, K.C. Crosthwaite. Crosthwaite had most recently served as the vice president and chief growth officer of Altria Client Services LLC, overseeing the company's work, including digital marketing, packaging design & innovation; product development; and safety, health, and environmental affairs. Crosthwaite is a career Altria executive who knows Big Tobacco's playbook all too well, having previously served as the

---

[89] *Id.*

[90] Kate Rooney and Angelica LaVito, *Altria shares fall after FDA's Gottlieb describes 'difficult' meeting on Juul*, CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html.

president and CEO of Philip Morris USA, the vice president and general manager at Marlboro, and the vice president of strategy and business development at Altria Client Services LLC.

73. This arrangement was profitable for both companies. JUUL employees received $2 billion in bonuses, which, split among the company's 1,500 employees, was approximately $1.3 million per employee,[91] and Altria received millions of teen customers.

74. JUUL claims its mission is to "improve the lives of the world's one billion adult smokers by eliminating cigarettes," and its advertising now encourages "making the switch."[92] Similarly, Altria's CEO Howard Willard claimed that it invested in JUUL to help "switching adult smokers" and "reduce harm."[93] But JUUL does not have FDA approval as a cessation device. This may be because, as one company engineer said: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[94]

75. JUUL also does not have authority or any basis to claim that its product is healthier than cigarettes. On September 9, 2019, the FDA warned JUUL that has it violated federal law by making unauthorized representations that JUUL products are safer than cigarettes.[95]

76. Moreover, even if JUUL were to obtain FDA approval as a legitimate smoking cessation device, this has no impact—and certainly does not excuse—the Defendants' past and

---

[91] Olivia Zaleski, *Juul Employees to Get $2 Billion Bonus in Altria Deal*, Bloomberg (Dec. 20, 2018), https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus-in-altria-deal.

[92] Lyndsey Cambridge, *Thornton's Budgens links with Juul offer smoking cessation service*, The Grocer, Sept. 9 2019, https://www.thegrocer.co.uk/health/thorntons-budgens-links-with-juul-to-offer-smoking-cessation-service/597359.article.

[93] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-%20Accelerate.

[94] Nitasha Tiku, *Startup Behind the Lambo of Vaporizers Just Launched an Intelligent e-Cigarette*, The Verge (Apr. 21, 2015), https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul.

[95] *Juul Labs, Inc. Warning Letter*, U.S. Food and Drug Admin. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

present conduct that targets youth. Regardless of the potential health benefits to chain smokers from switching to vaping from smoking, there is no benefit to young people from starting to vape.

77. To be clear, a key part of revenue growth like JUUL's is addicting youth to nicotine, as the tobacco industry has long known. Beginning in the 1950s, JUUL's now corporate affiliate, Philip Morris, intentionally marketed cigarettes to young people under the age of 21 to recruit "replacement smokers" to ensure the economic future of the tobacco industry.[96] Philip Morris knew that youth smoking was essential to the tobacco industry's success and longevity, as an internal Philip Morris document makes clear: "It is important to know as much as possible about teenage smoking patterns and attitudes. Today's teenager is tomorrow's potential regular customer and the overwhelming majority of smokers first begin to smoke while still in their teens."[97] For this reason, tobacco companies focused on the 14-24 year-old age group, because "younger adult smokers have been the critical factor in the growth" of tobacco companies, and the 14-18 year-old group was an increasing segment of the smoking population.[98] As the Vice-President of Marketing at R.J. Reynolds Tobacco Company ["RJR"] explained in 1974, the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume— for at least the next 25 years."[99] RJR's now-infamous Joe Camel "ambassador of Cool" advertising campaign, which ran from 1988 through 1997, exemplifies the importance the tobacco industry placed on hooking young smokers early.[100]

---

[96] Amended Final Opinion at 972, ECF. No. 5750, *U.S. v. Philip Morris*, No. 99-cv-2496 (D.D.C. Sept. 8, 2006).

[97] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

[98] *Id.*

[99] C.A. Tucker, *Marketing Plans Presentation to RJRI B of D*, Truth Tobacco Industry Documents, U. of S.F. (Sept. 30, 1974), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=ypmw0091 at 2.

[100] *Joe Camel: Character of the Year Advertisement*, Stanford U. Res. into the Impact of Tobacco Advert. (1990), http://tobacco.stanford.edu/tobacco_main/images.php?token2=fm_st138.php&token1=fm_img4072.php&theme_.

**D. The Secret to JUUL's Success: Hooking Kids**

78. It is clear that JUUL, like Philip Morris and RJR before it, targeted youth as a key business demographic. A recent study showed that 15-17 year-olds are *16 times* more likely to use JUUL than 25-34 year-olds.[101]

79. Indeed, JUUL was well aware from the beginning that its products would appeal to youth. A former JUUL manager, who spoke to *The New York Times* on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes 10 or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[102]

80. This "suspicion" has been studied by researchers, who estimated that over 44 percent of JUUL's Twitter account was being followed by underage youth.[103]

81. Because of Big Tobacco's demonstrated effectiveness at addicting youth to nicotine, cigarette manufacturers, under the Master Settlement Agreement and subsequent regulations, must operate under tight restrictions regarding their advertising and marketing activities. By way of example, cigarette companies may not: use outdoor advertising such as billboards; sponsor events; give free samples; pay any person to "use, display, make reference to or use as a prop any Tobacco Product, Tobacco Product package . . . in any . . . 'Media;'"[104] pay any third party to

---

[101] Joyce Frieden, *Vaping Companies Marketing to Teens, House Panel Told*, MedPage Today (July 24, 2019), https://www.medpagetoday.com/primarycare/smoking/81210.

[102] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?* N.Y. Times (Aug. 27, 2019), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[103] Annice Kim et al., *Estimated Ages of JUUL Twitter Followers*, JAMA Network (May 20, 2019), https://jamanetwork.com/journals/jamapediatrics/article-abstract/2733855.

[104] *Master Settlement Agreement*, (Nov. 1998), https://publichealthlawcenter.org/sites/default/files/resources/master-settlement-agreement.pdf at 17.

conduct any activity which the tobacco manufacturer is prohibited from doing[105]; or sell "flavored" cigarettes.[106]

82. All of these above activities were prohibited because of their effectiveness at appealing to youth. As described below, all of these activities figured prominently in JUUL's marketing campaign.

83. According to Dr. Robert Jackler, an otolaryngologist and professor at Stanford University School of Medicine and principal investigator for SRITA, JUUL's initial marketing was "patently youth oriented."[107] The JUUL's 2015 ad campaign, called "Vaporized" was designed to create a "cult-like following."[108] Its imagery featured a vivid color scheme and models in their twenties in poses that researchers note are evocative of behaviors more characteristic of underage teens than mature adults.[109] Dr. Jackler and his colleagues found it "clear" that this imagery resonated with underage teens who aspire to emulate trendsetting young adults.[110]

84. Tobacco advertisers have long understood that teens are attracted to such imagery. The Vaporized campaign was featured on the front page of VICE magazine, which claims to be "the #1 youth media company" in the world.[111]

85. In the summer of 2015, an animated series of Vaporized billboards, with the campaign's youth-appealing imagery, were displayed in New York's Times Square.[112]

86. Over the first year after JUUL launched its ad campaign in June 2015, it held a series of at least 50 highly stylized parties, typically with rock music entertainment, in cities across the United States.[113] Thousands of young people were given free nicotine-filled JUULpods

---

[105] *Id.* at 18.

[106] Family Smoking Prevention and Tobacco Control and Federal Retirement Reform Act, Pub. L. No. 111-31, § 907, 123 Stat 1776, 1799 (2009).

[107] Robert K. Jackler, *The Role of the Company in the Juul Teen Epidemic, Testimony of Robert Jackler before the House Subcommittee on Economic and Consumer Policy* (July 24, 2019), https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf at 2 ("Jackler Testimony").

[108] *Id.* at 4.

[109] JUUL Advertising at 7.

[110] *Id.*

[111] *Id.* at 16-17.

[112] *Id.*

[113] *Id.* at 27.

(appropriately named "JUUL starter kits"), and JUUL posted photos of various young people enthusiastically puffing on JUULs across their social media channels.[114] JUUL also featured popular stars such as Katy Perry holding a JUUL at the Golden Globes.[115]

87. JUUL knew these images would be successful in achieving this result because it intentionally crafted them to mimic specific traditional tobacco advertisements that Big Tobacco had used to target teens. In fact, many of JUUL's ads are nearly identical to old cigarette ads that were designed to get teens to smoke. Like its Big Tobacco predecessors, the focus of JUUL's initial marketing was on colorful ad campaigns using eye-catching designs and youth-oriented imagery with themes of being cool, carefree, stylish, attractive, sexy, and popular—unusual themes and images if one's objective is to promote an adult's only smoking cessation device.

88. JUUL used Big Tobacco's advertising imagery, but coupled it with a modern, state-of-the-art marketing campaign designed to target youth. It relied heavily on social media, crafting a powerful online presence, which persists even after JUUL deleted its accounts in the face of mounting public scrutiny. JUUL was particularly active on Instagram, which is the most popular social media site among teens.[116] JUUL cultivated hashtags, allowing the company to blend its ads in with a wide range of user content, increasing exposure while concealing the commercial nature of the content.[117] JUUL then used hashtags to reinforce the themes it crafted in its product design, like #style, #technology, #smart, and #gadget. JUUL's hashtags attracted an enormous community of youthful posts on a wide array of subjects. According to Dr. Jackler, #Juul contains literally thousands of juvenile postings, and numerous Instagram hashtags contain the JUUL brand name.[118] Even after JUUL halted its own social media posts in November 2018, viral peer-to-peer promotion among teens insured continued corporate and product visibility among youth.[119] In fact, community posts about JUUL increased after JUUL itself quit social

---

[114] *Id.*
[115] Jackler Testimony at 8.
[116] JUUL Advertising at 34.
[117] *Id.* at 34.
[118] Jackler Testimony at 10.
[119] *Id.* at 11.

media in the fall of 2018. Prior to November 2018, over a quarter of a million posts appeared. In the eight months *after* JUUL halted its promotional postings, the rate of community postings increased significantly, resulting in the number of posts doubling to over half a million.[120]

89. JUUL also paid social media influencers to post photos of themselves with JUUL devices and to use the hashtags that it was cultivating.[121] JUUL entered a contract with an advertising agency specifically to identify and recruit social media influencers that had at least 30,000 followers to, according to an internal JUUL email, "establish a network of creatives to leverage as loyalists" for the JUUL brand.[122] One such influencer was Christina Zayas, whom JUUL paid $1,000 for just one blog post and one Instagram post in the fall of 2017.[123]

90. JUUL instituted an "affiliate program" to recruit those who authored favorable reviews of its products by providing such reviewers with a 20% discount of purchases of JUUL products.[124] It even recruited JUUL users to act as part of their marketing team by asking users to "refer a friend and get a discount."[125]

91. Such tactics masked what were in fact JUUL advertisements as user content, further increasing exposure and ultimately solidifying the company in teen pop culture as a form of cultural currency. JUUL's strategy was so successful in embedding its products into pop culture that it entered the vernacular as a verb. The JUUL device and the term "juuling" are so pervasive that JUUL effectively eliminated not only competitors, but also any potentially alarming terms like "smoking" or "e-cigarette," which could alert users of the true nature of the device or activity. A recent study found that 63% of adolescent JUUL users did not know that

---

[120] *Id.*

[121] JUUL Advertising.

[122] Kenrick Cai, *Juul Funded High Schools, Recruited Social Media Influencers To Reach Youth, House Panel Charges*, Forbes (July 25, 2019), https://www.forbes.com/sites/kenrickcai/2019/07/25/juul-high-schools-influencers-reach-youth-house-investigation/#777f3be933e2.

[123] Michael Nedelman et al., *#Juul: How social media hyped nicotine for a new generation*, CNN Health (Dec. 19, 2018), https://www.cnn.com/2018/12/17/health/juul-social-media-influencers/index.html.

[124] Jackler Testimony at 9-10.

[125] Jackler Testimony at 9.

JUULpods contain nicotine.[126] This has worked to JUUL's advantage and was in fact a deliberate part of its strategy. In the first year after its launch, not one of JUUL's 171 promotional emails said anything about nicotine content,[127] and it did not include nicotine warnings on the JUUL packaging until August 2018, when it was forced to do so.

92. The design of JUUL's product is also acutely attractive to youth. Unlike most of its predecessors, JUUL looks nothing like a cigarette. Instead, JUUL is sleek and linear and seems like the latest tech invention. This is not surprising, given the founders' Silicon Valley product design education and training. The evocation of technology makes the JUUL device familiar and desirable to the younger tech-savvy generation, particularly teenagers. The JUUL device even has features reminiscent of youth-oriented tech culture and gaming, like "secret" features users can unlock, such as making the indicator light flash rainbow colors in "party mode." JUUL has been so successful in emulating technology that the small, rectangular devices are often mistaken for—or passed off as—flash drives.

93. The ability to conceal a JUUL is also part of the appeal for adolescents. The devices are small and slim, so they fit easily in a closed hand or a pocket. The ease and simplicity of use—there is nothing to light or unwrap, not even an on-off switch—also make it possible to covertly use a JUUL behind a turned back, which has become a trend in many schools. Finding new ways to hide the ever-concealable JUUL has spawned products designed just for that purpose, such as apparel that allows the wearer to use the device while it is concealed in the drawstring of a hoodie or the strap of a backpack.[128]

94. JUUL also created special flavors that make its addictive, high-tech device even more attractive to adolescents. Tobacco companies have known for decades that flavored products are key to nicotine adoption by youth. A 1972 Brown & Williamson memorandum entitled:

---

[126] *Juul e-Cigarettes Gain Popularity Among youth, But Awareness of Nicotine Presence Remains Low*, Truth Initiative (Apr. 18, 2018), https://truthinitiative.org/press/press-release/juul-e-cigarettes-gain-popularity-among-youth-awareness-nicotine-presence.

[127] JUUL Advertising at 25.

[128] Evie Blad, *'Juuling' and Teenagers: 3 Things Principals and Teachers Need to Know*, Educ. Wk. (July 18, 2018), https://www.edweek.org/ew/articles/2018/07/18/juuling-and-teenagers-3-things-principals-and.html.

"Youth Cigarette – New Concepts," specifically noted the "well-known fact that teenagers like sweet products."[129] A 1979 Lorillard memorandum concluded that younger customers would be "attracted to products with 'less tobacco taste," and even proposed borrowing data from the "Life Savers" candy company to determine which flavors enjoyed the widest appeal among youth.[130] According to 2004 data, 17-year-old smokers were more than three times likely as those over 25 to smoke flavored cigarettes and viewed flavored cigarettes as safer.[131] For this reason, in 2009 the FDA banned flavored cigarettes pursuant to its new authority under the Family Smoking Prevention and Tobacco Control Act of 2009. In announcing the ban, FDA Commissioner Dr. Margaret Hamburg declared that "flavored cigarettes are a gateway for many children and young adults to become regular smokers."[132]

95. There is no reason to believe that flavors play any different role with respect to e-cigarettes and youth. In fact, a 2017 study of the cigarette flavor ban found that the ban was effective in lowering the number of smokers and the amount smoked by smokers, though it was associated with an increased use of menthol cigarettes (the only flavor still available).[133] According to the Surgeon General, 85% of adolescents who use e-cigarettes use flavored varieties.[134] Studies also show that flavors motivate e-cigarette initiation among youth[135] and that

---

[129] K. M. Cummings et al., *Marketing to America's Youth: Evidence From Corporate Documents*, BMJ Journals Vol. 11, Issue Supp. 1 (Mar. 1, 2002), https://tobaccocontrol.bmj.com/content/11/suppl_1/i5.info.

[130] Laurie Halverson & Kathy Sheran, *Big Tobacco Lurks Behind E-Cigarettes*, Star Tribune (Apr. 10, 2014, 6:40 PM), https://www.startribune.com/big-tobacco-lurks-behind-e-cigarettes/254821801/.

[131] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

[132] *Id.*

[133] Stanton A. Glantz, PhD, *More evidence to support eliminating flavors to reduce youth cigarette and e-cigarette use*, UCSF Center for Tobacco Control Research and Education *Cigarette Ban on Adolescent Tobacco Use*, 52(5) Am. J.of Preventive Med. 3139 (Jan. 9, 2017); MB. Harrell, et al., *Flavored e-cigarette use: Characterizing youth, young adult, and adult users*, 5 Preventive Med. Rep. 33 (Nov. 11, 2016)

[134] E-Cigarette Use Among Youth and Young Adults, U.S. Dept. of Health and Human Services (2016), https://www.ctclearinghouse.org/Customer-Content/www/topics/2444-E-Cigarette-Use-Among-Youth-And-Young-Adults.pdf.

[135] Karl Paul, *Flavored Vapes Lure Teens Into Smoking and Nicotine Addiction, Study Shows*, MarketWatch (Feb. 26, 2019), https://www.marketwatch.com/story/flavored-vapes-lure-teens-into-smoking-and-nicotine-addiction-study-shows-2019-02-25.

youth are much more likely to use flavored tobacco products than adults are.[136] In fact, in September 2019, the State of Michigan banned flavored e-cigarettes, a step the governor said was needed to protect young people from the potentially harmful effects of vaping; Governor Andrew Cuomo of New York announced that he would pursue emergency regulations to ban the sale of flavored e-cigarettes;[137] and Governor Jay Inslee of Washington State ordered the Washington State Department of Health to ban all flavored vapor products.[138] Despite JUUL's claims that its target market is adult smokers, the company entered the market with flavors like Cool Mint, Crème Brulee, Fruit Medley, Cucumber, and Mango. These flavors were the reason countless adolescents started using JUUL products.

96. The flavors pose dangers beyond luring young people into trying nicotine. Studies now show these sweet and fruity flavors present distinct additional health hazards. Researchers have found that some of the chemicals JUUL uses for flavor and perfume— particularly in the Crème Brulee flavor—contain relatively high levels of acetals.[139] Acetals are airway-irritating chemicals that may cause lung damage.[140] Dr. Robert Jackler said that test results have shown that JUUL's sweet and fruity flavors "contribute[] to the increasing body of evidence documenting toxicological effects of e-cig vapor . . . ."[141]

97. On November 19, 2019, the American Medical Association (AMA) called for the total ban on all e-cigarette and vaping products that do not meet FDA approval as cessation tools. Physicians, residents, and medical students from across the country voted to adopt policies on

---

[136] AC Villanti et al., *Flavored Tobacco Product Use in Youth and Adults: Findings From the First Wave of the PATH Study (2013-2014)*, 53 Am. J. of Preventative Med. 139 (2017), https://pubmed.ncbi.nlm.nih.gov/28318902/.

[137] Jesse McKinley & Christina Goldbaum, *New York Moves to Ban Flavored E-Cigarettes by Emergency Order*, N.Y Times (Sept. 15, 2019), https://www.nytimes.com/2019/09/15/nyregion/vaping-ban-ny.html.

[138] Gov. Jay Inslee, Exec. Order No. 19-03 Addressing the Vaping Use Public Health Crisis (Sept. 27, 2019), https://www.governor.wa.gov/sites/default/files/19-03%20-%20Addressing%20the%20Vaping%20Public%20Health%20Crisis%20%28tmp%29.pdf?utmmedium=email&ut%20m source=govdelivery.

[139] Susie Neilson, *Irritating Compounds Can Show Up in 'Vape Juice'*, NPR (July 30, 2019), https://www.npr.org/sections/health-shots/2019/07/30/746238009/irritating-compounds-discovered-in-vape-juice.

[140] *Id.*

[141] *Id.*

AMA's longtime efforts to prevent another generation from becoming dependent on nicotine. As part of the request for a ban, AMA President Patrice A. Harris, M.D., M.A., said "It's simple – we must keep nicotine products out of the hands of young people and that's why we are calling for an immediate ban on all e-cigarette and vaping products from the market. With the number of young people using e-cigarettes spiking it is not only critical that there is research into nicotine addiction treatments for this population, but it is imperative that we continue efforts to prevent youth from ever using nicotine."[142]

**E. The Cost of JUUL's Success**

98. In addition to designing its devices to be particularly attractive to youth, JUUL designed its devices to be highly addictive. Unlike most other e-cigarettes, which use freebase nicotine, JUUL uses patented nicotine salts from which it makes liquid nicotine cartridges, or JUULpods.[143] Each JUULpod is, according to the company, the equivalent of a pack of cigarettes. Each pod contains an alarming amount of nicotine, with up to 59 mg per ml—an amount that is roughly three times the amount of nicotine that can be sold to consumers in the European Union in a JUULpod. On top of ramping up the amount of nicotine, JUULpods enabled the company to increase the rate and amount of nicotine delivery to the JUUL user, roughly doubling the concentration and nearly tripling the delivery speed of nicotine of the average e-cigarette.[144]

99. Big Tobacco spent decades manipulating nicotine in order to foster and maintain addiction in their customers. RJR developed and patented nicotine salt additives, including nicotine benzoate, to increase nicotine delivery in cigarette smoke. The objective was to provide an additional "nicotine kick" based on increased nicotine absorption associated with lower pH.

---

[142] Press Release, American Med. Ass'n, *AMA calls for total ban on all vaping products not approved by FDA* (Nov. 19, 2019), https://www.ama-assn.org/press-center/press-releases/ama-calls-total-ban-all-vaping-products-not-approved-fda.

[143] Rachel Becker, *Juul's Nicotine Salts Are Dominating the Market – And Other Companies Want In*, The Verge (Nov. 21, 2018), https://www.theverge.com/2018/11/21/18105969/juul-vaping-nicotine-salts-electronic-cigarettes-myblu-vuse-markten.

[144] *How Much Nicotine is In Juul?*, Truth Initiative (Feb. 26, 2019), https://truthinitiative.org/research-resources/emerging-tobacco-products/how-much-nicotine-juul.

JUUL uses this very same concept for its market-dominating e-cigarettes. The company's patent for its nicotine salts describes a process for combining benzoic acids with nicotine, a formulation that mimics the nicotine salt additive developed by RJR. JUUL's use of benzoic acid and manipulation of pH affect the palatability of nicotine inhalation by reducing the "throat hit" that users experience when vaping. Indeed, this was the objective behind using nicotine salts (as compared to "free base nicotine" which has a higher pH). According to Ari Atkins, one of the inventors of the JUUL device, "[i]n the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it . . . I've got to choose the words carefully here: Appropriate for inhalation."[145]

100. Because smokers are already accustomed to a certain level of harshness and throat hit, developing a product with low levels of harshness and minimal "throat hit" is only a critical concern if your goal is to appeal to non-smokers, for example, youth. Minimizing the harshness of nicotine also allows one to vape more frequently and for longer periods of time and masks the amount of nicotine being delivered by eliminating the unpleasant throat hit normally associated with large doses of nicotine. The harshness of freebase nicotine makes prolonged vaping difficult; the use of nicotine salts solves that problem. Put another way, the nicotine salt technology behind JUULpods makes JUUL "smoke" highly potent yet hardly perceptible.

101. The increased nicotine exposure facilitated by the JUUL device has serious health consequences. The ease of use and "smoothness" strip away external inhibitors and enable extreme levels of unfettered use. Using JUUL's own calculations, consuming two JUULpods in a day is the equivalent of consuming two to four packs of cigarettes a day. In this way, JUUL has not only created a new generation of e-cigarette smokers but has also pioneered a new style of smoking—vaping—that is more nicotine-saturated than ever before.

102. Increased rates and duration of smoking lead to greater overall exposure to nicotine. Nicotine is a neurotoxin. A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat

[145] David Pierce, *This Might Just Be the First Great E-Cig*, Wired.com (Apr. 21, 2015), https://www.wired.com/2015/04/pax-juul-ecig/.

to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[146] Studies also show that exposure to nicotine as a teen—even minimal exposure—biologically primes the brain for addiction and greatly increases likelihood of dependence on nicotine as well as other substances later in life.[147]

103. Exposure to nicotine during adolescence through young adulthood can disrupt the formation of brain circuits that control attention and learning because the brain is not fully developed until the mid-20s. Nicotine activates the limbic system more strongly in the adolescent brain than in the adult brain, making addiction a significantly greater risk for youth who use nicotine. Young people are also at risk for long-term effects of exposing their brains to nicotine, including mood disorders and permanent lowering of impulse control.

104. Nicotine addiction is a serious injury recognized by the medical community in the Diagnostic and Statistical Manual (DSM), categorized by "a problematic pattern of tobacco use, leading to clinically significant impairment or distress."[148]

105. Medical research has revealed the difficulty of ceasing use of nicotine through nicotine withdrawal. Nicotine withdrawal is categorized by irritability, anxiety, difficulty concentrating, restlessness, increased appetite, dysphoric or depressed mood, and insomnia.[149]

106. According to the National Institute of Drug Abuse, 31% of the teen e-cigarette users will start smoking within six months, compared to 8% of non-e-cigarette users.[150]

---

[146] Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortex Neuronal Network Function*, 2(12) Cold Spring Harbor Persp. Med. 2 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/pdf/cshperspectmed-ADD-a012120.pdf.

[147] Michelle Ren and Shahrdad Lotfipour, *Nicotine Gateway Effects on Adolescent Substance Use*, West J. Emergency Med. (Aug. 20, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6754186/.

[148] Psychology Today, *Tobacco-Related Disorders*, https://www.psychologytoday.com/us/conditions/tobacco-related-disorders#:~:text=Symptoms,period%20of%20time%20than%20intended (last visited Aug. 5, 2020).

[149] Ian McLaughlin et al., *Nicotine Withdrawal*, U.S. Nat'l Library of Medicine, Nat'l Institutes of Health (Aug. 19, 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4542051/.

[150] National Institute on Drug Abuse, *Teens and E-cigarettes* (Updated February 2016),

*Footnote continued on next page*

107. Signs of addiction to nicotine include trembling, nausea, and frequent e-cigarette use. Other tell-tale signs are frequent trips to the bathroom, reports of illness, or hand-to-mouth activity.

108. According to congressional testimony from Dr. Jonathan Winickoff, a professor of pediatrics at Harvard Medical School and the Director of Pediatric Research in the Tobacco Research and Treatment Center, "[n]icotine addiction can take hold in only a few days, especially in the developing adolescent brain that is particularly vulnerable to addiction to nicotine . . . Many of my patients find JUUL nearly impossible to stop. Nicotine withdrawal can cause headaches, insomnia, irritability, anxiety, and depression, and these withdrawal symptoms are one of the primary reasons a nicotine addiction is difficult to overcome."[151] Moreover, there is a lack of effective tools to help adolescents overcome nicotine addiction:

109. there is no good data on how to treat adolescents with e-cigarette dependence; there has not been enough research on youth tobacco cessation strategies; and most of the pharmacological therapies approved for adults have been shown to be ineffective or only marginally effective in adolescents.[152]

110. Research in Massachusetts indicates that daily JUUL and other e-cigarette use is much more likely to continue than daily cigarette smoking. Out of the surveyed students who reported ever using cigarettes, only 17% indicated that they remained daily smokers. Out of the surveyed students who reported ever using e-cigarettes daily, 58% remained daily users. This data "demonstrates that e-cigarette use in teens is very persistent, a result consistent with the addictiveness of JUUL and the difficulty teens have in trying to quit."[153]

---

*Footnote continued from previous page*
https://www.drugabuse.gov/drug-topics/trends-statistics/infographics/teens-e-cigarettes.

[151] *Examining JUUL's Role in the Youth Nicotine Epidemic: Part I, Hearing Before the Subcomm. on Econ. and Consumer Policy of the H. Comm. on Oversight and Reform*, 116th Cong. (2019) (statement of Jonathan P. Winickoff, American Academy of Pediatrics) ("Winickoff Testimony"), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf at 2-3.

[152] *Id.* at 3.

[153] *Id.* at 2.

111. E-cigarette use also puts adolescents at increased risk for cigarette smoking. Compared to adolescents who do not use e-cigarettes, those who do are 3.5 times more likely to begin smoking cigarettes.[154]

112. The dangerous and destructive nature of nicotine is no recent discovery. As a key ingredient in tobacco products, the drug and its deleterious effects have been the subject of scientific research and public health warnings for decades. Nicotine causes cardiovascular, reproductive, and immunosuppressive problems with devastating effects. Part of the reason the national decline in cigarette use in recent years was such a victory for public health was because there was a corresponding decline in teen exposure to nicotine. From 2000 to 2017, the smoking rate among high school students fell by 73%.[155]

113. That trend has been completely reversed. In 2018, more than one in four high school students in the United States reported using a tobacco product in the past thirty days, a dramatic increase from just one year before.[156] But there was no increase in the use of cigarettes, cigars, or hookahs during that same time period.[157] There was only increased use in a single tobacco product: e-cigarettes. While use of all other tobacco products continued to decrease as it had been for decades, e-cigarette use among high school students increased 78% in just one year.[158] This drastic reversal caused the CDC to describe youth vaping an "epidemic."[159]

---

[154] *Id.*

[155] Press Release, Matthew L. Myers, President, Campaign for Tobacco-Free Kids, *Press Release: On 20th Anniversary of State Tobacco Settlement (the MSA), It's Time for Bold Action to Finish the Fight Against Tobacco, Campaign for Tobacco-Free Kids* (Nov. 26, 2018), https://www.tobaccofreekids.org/press-releases/2018_11_26_msa20.

[156] Press Release, Ctrs. For Disease Control and Prevention, *Progress Erased: Youth Tobacco Use Increased During 2017-2018* (Feb. 11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.

[157] Ctrs. for Disease Control and Prevention, *Tobacco Use By Youth Is Rising: E-Cigarettes are the Main Reason* (Feb. 2019), https://www.cdc.gov/vitalsigns/youth-tobacco-use/index.html.

[158] Scott Gottlieb, U.S. Food & Drug Admin., *Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes*, U.S. Food & Drug Admin. (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access.

[159] Jerome Adams, Ctrs. For Disease Control and Prevention, *Surgeon General's Advisory on E-cigarette Use Among Youth* 2 (Dec. 2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

114. The teen vaping epidemic of which JUUL is the architect has and will continue to have significant costs, both for individual users and for society. Nicotine addiction alone has significant health care costs, and these costs are exacerbated when adolescents are involved. Adolescent nicotine addiction leads to memory and attention problems, and increased chances of addiction later in life, all of which will continue to have long-lasting impacts on society.

115. Science is also beginning to show that e-cigarettes have the potential to cause even more, distinct health risks and costs. Research has shown that the flavor chemicals themselves are cytotoxic in both e-liquid and aerosol form.[160] One study looked at "eight pre-filled JUUL e-cigarette pods available on the market [and] found that all e-liquids and corresponding aerosols were cytotoxic to human lung epithelial cells."[161] The very same liquids that enable e-cigarettes to deliver nicotine with such potency are proving to be increasingly dangerous. When heated, the vape liquid turns into aerosol, which may contain, in addition to nicotine, ultrafine toxic particles such as heavy metals, additional chemicals, and volatile organic compounds.[162] These chemicals have the potential to be deadly. Vaping is now linked to conditions like chronic obstructive pulmonary disease and seizures, and there were 193 possible cases of severe lung illness associated with e-cigarette product use in 22 states in less than two months in the summer of 2019 alone.[163] Public health officials reported the first known death from a vaping-related illness on August 23, 2019.[164] As of February 18, 2020, there have been a total of 2,807 hospitalized E-Cigarette or Vaping Product Associated Lung Injury ("EVALI") cases or deaths in all 50 states,

---

[160] Washington State Board of Health, *Health Impact Review of HB 1932 Concerning Vapor Products – 2019 Legislative Session*, 13 (Sept. 2019) https://sboh.wa.gov/Portals/7/Doc/HealthImpactReviews/HIR-2020-01-HB1932..pdf?ver=2019-09-24-141026-263.

[161] *Id.*

[162] Lena H. Sun, *He went from hiking enthusiast to 'on death's door' within days. Doctors blamed vaping*, Wash. Post (Aug. 24, 2019), https://www.washingtonpost.com/health/one-mans-near-death-experience-with-vaping-related-lung-failure/2019/08/24/ca8ce42c-c5b4-11e9-9986-1fb3e4397be4_story.html.

[163] Press Release, Ctrs. For Disease Control and Prevention, *CDC, FDA, States Continue to Investigate Severe Pulmonary Disease Among People Who Use E-cigarettes* (last updated Aug. 23, 2019), https://www.cdc.gov/media/releases/2019/s0821-cdc-fda-states-e-cigarettes.html.

[164] Matt Richtel & Sheila Kaplan, *First Death in a Spate of Vaping Sicknesses Reported by Health Officials*, N.Y. Times (Aug. 23, 2019, updated Oct. 8, 2019), https://www.nytimes.com/2019/08/23/health/vaping-death-cdc.html.

the District of Columbia, and two U.S. territories.[165] This includes 68 confirmed deaths.[166] Additionally, of the 2,668 hospitalized EVALI cases or deaths reported to the CDC, as of January 14, 2020, 15% of the patients were under 18 years old.[167] As of July 15, 2020, California health officials reported 220 EVALI cases and five deaths.[168]

116. Many teenagers are simply unaware of these risks, an ignorance that JUUL preys on. According to Dr. Winickoff, many of his patients believe JUULing is harmless:

> Counseling teens and preteens on e-cigarette use is challenging. Many of my patients have wildly incorrect beliefs about e-cigarettes. They know that cigarettes are dangerous, but assume that Juul—since it's ubiquitous, comes in child-friendly flavors, and is marketed as a healthier alternative to smoking— must be harmless.
>
> I have to explain to kids that e-cigarettes do not have the same positive health benefits as the fruits whose flavors they copy. Even the term vapor calls to mind harmless water vapor. There is no water in these products.

Winickoff Testimony at 2.

117. A peer-reviewed medical article published by *JAMA Pediatrics* on January 21, 2020 analyzed the prevalence, patterns, and factors associated over time with e-cigarette use among adolescents and younger adults in the United States. The conclusions were in part as follows: "This study found that the e-cigarette device JUUL appears to be associated with the youth e-cigarette epidemic, attracting new users and facilitating frequent use with their highly addictive nicotine content and appealing flavors."[169]

---

[165] Ctrs. For Disease Control & Prevention, Outbreak of Lung Injury Associated with the Use of E-Cigarette, or Vaping, Products, (last updated Feb. 25, 2020) https://www.cdc.gov/tobacco/basic_information/e-cigarettes/severe-lung-disease.html.

[166] *Id.*

[167] Ctrs. For Disease Control & Prevention, Outbreak of Lung Injury Associated with the Use of E-Cigarette, or Vaping, Products, (last updated Feb. 25, 2020) https://www.cdc.gov/tobacco/basic_information/e-cigarettes/severe-lung-disease.html#map-cases.

[168] California Dept. Public Health, E-cigarette, or Vaping, Product Use Associated Lung Injury (EVALI) (last updated July 15, 2020) https://www.cdph.ca.gov/Programs/CCDPHP/Pages/EVALI-Weekly-Public-Report.aspx.

[169] Donna M. Vallone et al., *Electronic Cigarette and JUUL Use Among Adolescents and Young Adults*, 174(3) JAMA Pediatrics (published online Jan. 21, 2020).

118. The JAMA study further revealed that while JUUL products were claimed to be designed for adults to try to quit smoking cigarettes, nearly 8% of 15- to 17-year-olds had used JUUL within the past month, compared to just under 3% of older Americans.[170]

119. The research was conducted by the anti-tobacco advocacy group *Truth Initiative*. “Youth tobacco use is at its highest in nearly 20 years, primarily driven by e-cigarettes resulting in over 5 million youth now vaping across America,” Robin Koval, CEO and president of *Truth Initiative*, said in a news release. “Years of progress in the fight against youth tobacco [use] have been reversed with millions of teens, most of whom were not smokers, now using a high nicotine tobacco product.”[171] A large majority of California high school students surveyed reported that they "thought that young people were attracted to e-cigarettes by the flavors and because they *look interesting and cool*."[172] Within California, the region including the Yurok Tribe has higher rates of tobacco use and of e-cigarette use than the state as a whole.[173] American Indian and Alaska Native high school students in California use tobacco in general and e-cigarettes in particular at higher rates than their peers.[174]

**F. JUUL’s Remedial Measures**

120. In the face of increasing public scrutiny and pressure, JUUL has taken some action to curb underage use of its products, but its efforts have been ineffective at best and aggravating at worst. After media and researchers brought JUUL’s advertising tactics front and center, it launched a new ad campaign focusing on former smokers and it deleted social media accounts.

---

[170] Robert Preidt, *Vape Devices Like Juul ‘Reversing’ Efforts to Keep Youth from Tobacco: Study*, U.S. News and World Report (Jan. 21, 2020, 12:00 PM), https://www.usnews.com/news/health-news/articles/2020-01-21/vape-devices-like-juul-reversing-efforts-to-keep-youth-from-tobacco-study.

[171] Truth Initiative, *New Truth Initiative Study Finds JUUL Use Doubled in One Year as Tobacco and Nicotine Use Among Youth Reaches Highest Level in Decades* (Jan. 21, 2020), https://truthinitiative.org/press/press-release/new-truth-initiative-study-finds-juul-use-doubled-one-year-tobacco-and-nicotine.

[172] Shu-Hong Zhu et al., *California Student Tobacco Survey 2015-16: Results of the Statewide Student Survey*, Center for Research and Intervention in Tobacco Control, University of California, San Diego at 31.

[173] Shu-Hong Zhu et al., *Results of the Statewide 2017-18 California Student Tobacco Survey*, Center for Research and Intervention in Tobacco Control, University of California, San Diego at 69.

[174] *Id.* at 10.

But, JUUL designed its social media campaign to flourish from user-made content, which remains unaffected by the absence of a JUUL-run account. In fact, as noted above, posts relating to JUUL increased after it stopped its direct social advertising campaign.

121. JUUL's efforts to curb underage use through alterations to the product itself are similarly either ineffective or potentially damaging. JUUL's approach to its flavored products illustrates this point. In response to serious concerns about flavored products and youth vaping, JUUL did the following: (1) it slightly modified the flavor names (i.e., "Cool Mint" is now "Mint," "Crème Brulee" is now "Creme"); and (2) it limited the flavors carried by retail stores to tobacco and mint, while continuing to offer the full range of flavors (including popular ones such as Mango) online—a market which teens are particularly aware of and adept at navigating. As Dr. Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's anesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.

Winickoff Testimony at 4.

122. Similarly, restricting other flavors to online sales is of limited effectiveness. According to Dr. Winickoff, 80% of children get e-cigarettes from social sources, such as older friends, meaning that if the products are available for sale somewhere, children will get them.[175]

123. In October 2019, JUUL suspended the sale of non-tobacco, non-menthol based flavors (Mango, Crème, Fruit, and Cucumber) in the U.S. pending FDA review.

124. In November 2019, JUUL announced that the company would immediately stop accepting orders from its retailers for Mint JUULpods in the U.S. and would cease the sale of Mint JUULpods in the U.S. through its website.

[175] *Id.*

### G. JUUL and the Federal Response

125. In September 2019, President Trump, the first lady, and two of his top health officials gathered in the Oval Office to announce they would take what Mr. Trump called "very, very strong" action against the fast-growing epidemic of teenage vaping: a ban on the sale of most flavored e-cigarettes.[176]

126. In late December 2019, the President's administration announced they would forbid the sale of most flavored e-cigarette cartridges, but would exempt menthol and tobacco flavors, as well as flavored liquid nicotine sold in open - tank systems at vape shops.[177]

127. In late December 2019, the Food and Drug Administration ordered companies to stop manufacturing, distributing, and selling most cartridge-based e-cigarette flavors—including mint and fruity flavors—by early February 2020, saying the crackdown was urgently needed to stem a surge in teen vaping.[178]

128. On December 20, 2019, the President signed legislation amending the Federal Food, Drug and Cosmetic Act and raising the federal minimum age of sale of tobacco products from 18 to 21 years. It is now illegal for a retailer to sell any tobacco product, including e-cigarettes, to anyone under 21.

129. A bipartisan group of U.S. senators on January 22, 2020 announced that they have introduced legislation that would mandate e-cigarette companies to pay user fees to the U.S. Food and Drug Administration to fund stronger oversight over the industry. The senators—including Jeanne Shaheen, D-N.H., and Mitt Romney, R-Utah—said that the Resources to Prevent Youth Vaping Act authorizes the FDA to collect user fees from all makers of tobacco products, including e-cigarettes. While makers of traditional tobacco products currently pay FDA user fees, e-cigarette companies are currently exempt, according to the senators. The

---

[176] Abby Goodnough, Maggie Haberman, Sheila Kaplan, *With Partial Flavor Ban, Trump Splits the Difference on Vaping*, N.Y. Times (updated Feb. 12, 2020), https://www.nytimes.com/2020/01/02/health/flavor-ban-e-cigarettes.html.

[177] *Id.*

[178] Wash. Post News Serv., *FDA bars sales of most e-cigarette pod flavors after 30 days*, Herald and News (Jan. 3, 2020), https://www.heraldandnews.com/fda-bars-sales-of-most-e-cigarette-pod-flavors-after/article 2c51c3da-c953-56fa-99dd-857d266d621e.html.

proposed bill increases the total amount of user fees that will be collected in fiscal year 2020 by $100 million, the senators said. “This legislation gives FDA the authority and resources the agency needs to hold e-cigarette companies accountable, crack down on e-cigarette sales to minors and raise awareness among youth about the dangers of vaping,” Shaheen said in a statement.[179]

130. On January 22, 2020, Congress announced that in early February 2020, JUUL representatives, and those of other leading e-cigarette companies, would be called to testify about their role in creating the youth vaping crisis. “While consumers remain in the dark of the possible health consequences, these companies are making billions of dollars as they lure a new generation of young people into a lifetime of nicotine addiction,” Rep. Diana DeGette (D-Colo.), the chair of the oversight panel conducting the hearing, wrote in a press release. Despite spending more than $4 million lobbying Congress in 2019, JUUL has been criticized by everyone from former FDA Commissioner Scott Gottlieb to Sen. Elizabeth Warren (D-Mass.) for its role in fueling the youth vaping epidemic.[180]

### H. JUUL and California’s Response

131. California is among the number of states that have sought to take action against JUUL.

132. On September 16, 2019, California Governor Gavin Newsom issued Executive Order N-18-19, directing the California Department of Public Health and Department of Tax and Fee Administration to develop recommendations to reduce the availability of vaping to youth under 21 years of age and allocating at least $20 million for a “vaping awareness campaign.”[181] The Executive Order noted that vaping devices are the most commonly used tobacco product in California.[182]

---

[179] Emily Field, *Senators Unveil Bill Requiring Vape Cos. To Pay FDA*, Law360 (Jan. 22, 2020, 3:41 PM), https://www.law360.com/articles/1236604.

[180] *Congress calls Juul, four other vape companies to testify about youth vaping*, STAT (Jan. 22, 2020), https://www.statnews.com/2020/01/22/juul-other-vape-makers-testify/.

[181] Executive Order N-18-19, Exec. Dep’t State of Cal. (Sept. 16, 2019), https://www.gov.ca.gov/wp-content/uploads/2019/09/9.16.19-EO-N-18-19.pdf.

[182] *Id.*

133. On September 24, 2019, the California Department of Public Health issued a Health Advisory informing the public about the risks of vaping, including e-cigarettes. The Health Advisory also noted that "teenagers and young adults make up almost half of the people hospitalized with breathing problems from vaping in California."[183]

134. In October, 2019, the California Department of Public Health launched a public education media campaign targeting young adults and parents in order to address the outbreak of vaping related lunch illnesses and the growing teem vaping epidemic.[184]

## I. JUUL and Indian Tribes

135. Smoking rates have continued to remain disproportionately high among American Indian and Alaska Natives. According to the CDC, "American Indians/Alaska Natives have the highest prevalence of cigarette smoking compared to all other racial/ethnic groups in the United States," but the progress made in recent years in reducing cigarette smoking within the American Indian/Alaska Native population is quickly vanishing due to the explosion of JUUL vaping devices.[185]

136. More than 22% of American Indian and Alaska Native adults currently smoke cigarettes compared to 13.7% of American adults overall.[186] The reasons for the discrepancies are numerous and attributed to the fact that American Indians "suffer from the effects of historical trauma and stressors in our lives, and have problems in the areas of poverty, housing, all of these social determinants of health."[187]

---

[183] Cal. Dep't of Pub. Health, Health Advisory, Vaping Related Lung Illness: A Summary of the Public Health Risks and Recommendations for the Public (Sept. 24, 2019) https://www.cdph.ca.gov/Programs/CCDPHP/CDPH%20Document%20Library/California%20Department%20of%20Public%20Health%20-%20Health%20Advisory%20September%2024,%202019.pdf.

[184] Cal. Dep't. of Pub. Health, New Public Education Campaign Targets Deadly Outbreak of Vaping-Related Illness (Oct. 24, 2019) https://www.cdph.ca.gov/Programs/OPA/Pages/NR19-028.aspx.

[185] Centers for Disease Control & Prevention, *American Indians/Alaska Natives and Tobacco Use*, https://www.cdc.gov/tobacco/disparities/american-indians/index.htm (last visited Aug. 5, 2020).

[186] Jamie Ducharme, *'It's Insidious': How Juul Pitched E-Cigs to Native American Tribes*, Time (Feb. 6, 2020, 11:38 AM), https://time.com/5778534/juul-native-american-tribes/.

[187] *Id.*

137. E-cigarette use is a growing problem for American Indian youth. According to National Youth Tobacco Survey data, 16.1% of American Indian and Alaska Native middle school students and 40.4% of American Indian and Alaska Native high school students were current users of e-cigarette products.[188] This is much higher than the general population rate of 27.5% of high school students and 10.5% of middle school students who use e-cigarette products.[189]

138. JUUL has specifically targeted the American Indian population with false and misleading statements about its products. On February 5, 2020, the United States House of Representatives Subcommittee on Economic and Consumer Policy found that, among other damaging things, "JUUL's targeting of Native American Tribes was more pervasive than initially known[.]"[190] The Subcommittee "exposed JUUL's pervasive targeting of children by obtaining testimony about JUUL: (1) presenting to kids in school and falsely claiming that JUUL was 'totally safe'; (2) sponsoring summer camps for kids as young as eight; (3) targeting Native Americans as guinea pigs for its product; (4) targeting other vulnerable populations, including veterans and minority communities; and (5) implementing a vast and sophisticated network of social media influencers . . .".[191]

139. In particular, between December 2018 and February 2019, the Congressional Subcommittee accepted testimony from JUUL indicating that it had specifically targeted at least eight Indian Tribes: (a) the Moapa Band of the Paiute Tribe; (b) the Lummi Nation; (c) the Nooksack Tribe; (d) the Cheyenne River Sioux Tribe; (e) the S'Klallam Tribe; (f) the Chickasaw Nation; (g) the Muckleshoot Tribe; and (h) the Kalispel Tribe.[192] JUUL also admitted that it

---

[188] Truth Initiative, *Tobacco use in the American Indian/Alaska Native communities* (May 28, 2020), https://truthinitiative.org/research-resources/targeted-communities/tobacco-use-american-indianalaska-native-community.

[189] *Id.*

[190] Subcommittee Staff, *Memorandum re Update on the Subcommittee's E-Cigarette Investigation*, *Subcomm. on Econ. and Consumer Policy of the H. Comm. on Oversight and Reform*, 116th Cong. (Feb. 5, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-02-04.RK%20Memo%20re%20JUUL.pdf at 8.

[191] *Id.* at 4.

[192] *Id.* at 9.

contacted an undisclosed additional number of tribes with marketing pitches, but has refused to identify those additional tribes or even indicate how many tribes were contacted.[193]

140. The Congressional Subcommittee found that representatives of JUUL have appeared at tribal council meetings of various Indian Tribes offering free JUUL vaping devices.[194] JUUL representatives told tribal members they were better off without cigarettes and could replace them with JUUL's cool electronic vaping devices and cartridges as part of a so-called "switching program."[195]

**J. Impacts on the Yurok Tribe**

141. The Yurok Tribe and its members have been directly impacted by the e-cigarette epidemic and surge in vaping created by Defendants' misconduct. Vaping use by members of the Yurok Tribe has reversed the positive trend of decreased cigarette use and nicotine addiction.

142. Defendants' activities have caused Yurok Tribe members to become addicted to Defendants' e-cigarette products.

143. Defendants' marketing strategy, advertising, and product design directly targets minors, especially teenagers, and has dramatically increased the use of JUUL products amongst youth and underage Yurok Tribe members.

144. More and more of the Yurok Tribe's resources are needed to combat these problems, leaving a diminished pool of already-scarce resources to devote to positive societal causes like education, cultural preservation, and other social programs.

145. As a direct and proximate result of the conduct of each of the Defendants, and in particular, their pattern of racketeering activity, the Yurok Tribe has been injured in its business and property in multiple ways, including, but not limited to, the diversion of profits from tribally

---

[193] *Id.*
[194] *Examining JUUL's Role in the Youth Nicotine Epidemic: Part I, Hearing Before the Subcomm. on Econ. and Consumer Policy of the H. Comm. on Oversight and Reform*, 116th Cong. (2019) (statement of Rae O'Leary, Public Health Analyst, Missouri Breaks Industries Research), https://www.govinfo.gov/content/pkg/CHRG-116hhrg37935/html/CHRG-116hhrg37935.htm (last visited Aug. 5, 2020).
[195] *Id.*

owned business enterprises that could otherwise have been reinvested in those business enterprises.

146. Because the Yurok Tribe is in an isolated location, it has only limited businesses and discretionary income to put toward urgent priorities, including efforts to stem the vaping epidemic, which has had a particularly harmful impact on the Yurok Tribe's youth.

147. The Yurok Tribe’s governmental resources have been severely burdened by the nicotine addiction epidemic that the Defendants’ conduct has created, requiring the Yurok Tribe to expend funding derived from its business activities to address the crisis, when such funds otherwise could have been reinvested in the Yurok Tribe’s business. These expenditures therefore constitute an injury to the Yurok Tribe’s business or property.

148. The Yurok Tribe has expended a significant part of its limited resources on addiction treatment and prevention programs specific to addiction of tobacco and e-cigarettes. Significant further resources will be required now and in the future to continue to respond to the widespread vaping by members of the Yurok Tribe and the addictive habits and behavior that it has caused.

149. The Yurok Tribe has been compelled to redirect its limited resources to help combat Defendants’ false, deceptive, and misleading marketing scheme, and to educate youth and their parents of the true dangers of e-cigarettes. For example, the Yurok Tribe has devoted resources to seek and apply for limited duration grants in order to (among other things) train Yurok youth as leaders and spokespersons to advance tobacco control efforts.

150. Even if e-cigarettes were entirely banned today, the Yurok Tribe’s members, and in particular its youth, would remain addicted to the nicotine contained in Defendants’ products.

151. Defendants’ actions have also served to confuse Indian traditions involving non-commercial tobacco with the marketing and sale of tobacco and e-cigarette products as described in booklet publication entitled “Clearing the Air, Sacred Use Not Abuse, a traditional tobacco booklet written for Native American youth”, which includes contributions from the Yurok Tribe.

152. The Yurok Tribe’s actions are necessary, but these measures cannot fully address the existing widespread use of vaping products and resulting nicotine addiction. Because of the

potency of JUUL's nicotine and ease of delivery widespread use of JUUL products has created a problem of addiction much greater than the Yurok Tribe can address with its current level of resources.

153. Fully addressing the harms to the Yurok Tribe caused by Defendants' conduct will require a comprehensive approach. Without the resources to fund these measures such as those described herein, the Yurok Tribe will continue to be harmed by the ongoing consequences of Defendants' conduct.

154. The harm that the Yurok Tribe has suffered and will continue to suffer cannot be addressed by agency or regulatory action. There are no rules that the FDA could make or actions that the agency could take that would provide the Yurok Tribe with the relief it seeks in this case.

155. Regulatory action would not be sufficient to compensate the Yurok Tribe for the money and resources that it has already expended on addressing the impacts of the vaping epidemic and the resources it will need in the future.

156. The costs that the Yurok Tribe has incurred and will incur in the future in responding to the vaping epidemic and in providing the public services described in this Complaint are recoverable pursuant to the causes of action raised by the Yurok Tribe. Defendants' misconduct alleged herein is not a series of isolated incidents, but instead involves a sophisticated and complex marketing scheme and related cover-up that has caused a continuing, substantial, and long-term burden on the services provided by the Yurok Tribe to its youth. Additionally, the public nuisance created by Defendants and the Yurok Tribe's requested relief in seeking abatement further compels Defendants to compensate the Yurok Tribe for the substantial resources it will need to continue to expend to address the vaping epidemic created by Defendants' misconduct.

157. The creation and maintenance of the e-cigarette epidemic directly harms the Yurok Tribe by imposing costs on its members and territory. As a result of Defendants' misconduct, the Yurok Tribe has been, and will be, forced to go far beyond what a governmental entity would be expected to pay to enforce the laws to promote the general health and welfare of the Yurok Tribe

and its members in order to combat the vaping crisis. This includes providing new programs and services in direct response to the damage caused by Defendants' misconduct.

158. Defendants' actions and omissions have substantially, unreasonably, and injuriously interfered with the functions and operations of the Yurok Tribe and have affected the public health, safety, and welfare of the Yurok Tribe's community. Without the vaping epidemic within the Yurok Tribe's community, more time, money, and resources could have been used for the Yurok Tribe's goal of increasing the health and welfare of its members.

## V. <u>CAUSES OF ACTION</u>

### COUNT I – VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *et seq.*

159. The Yurok Tribe hereby incorporates by reference the allegations contained in the preceding paragraphs of the Complaint.

160. At all relevant times, each Defendant is and has been a "person" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

161. The Yurok Tribe is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as it was and is injured in its business and/or property as a result of Defendants' wrongful conduct described herein.

162. Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

163. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." 18 U.S.C. § 1962(c).

164. Section 1962(d) makes it unlawful for "any person to conspire to violate" § 1962(a) and (c), among other provisions.

165. RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

166. Under RICO, an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

167. Defendants formed an enterprise comprised of JUUL; Altria Group, Inc., Altria Client Services LLC, Altria Group Distribution Company, Nu Mark LLC, Philip Morris USA, Inc.; James Monsees; Adam Bowen; Nicholas Pritzker; Hoyoung Huh; and Riaz Valani (collectively, the "JUUL Enterprise").

168. The JUUL Enterprise functions to achieve a shared goal: a scheme to deceive the public regarding the health risks and characteristics of JUUL e-cigarettes and JUULpods to encourage use of JUUL products, to enable use of JUUL products on school premises and during class, to improperly downplay or conceal the dangers posed by nicotine use, to design a product that facilitated e-cigarette use and initiation of use by non-smokers, to conceal the unparalleled potency of JUUL's e-cigarette, to addict the public to JUUL products, and to gain financially through unlawful means.

169. JUUL misstated and omitted material facts in social media posts—both its own posts and posts of its social media influencers, advertisements on JUUL's website, email messages, print materials including 2015 full-page ads in VICE magazine, point-of-sale advertising, free JUUL distribution events, "education" programs to schools and youth, and product packaging.

170. The JUUL Enterprise misrepresented or failed to adequately disclose that its products contained nicotine or how much nicotine JUUL products deliver to a user's bloodstream, including as compared to a combustible cigarette, as well as the benzoic acid levels JUULpods contain. JUUL further omitted the increased risk of addiction, physiological effects, and other severe health risks the higher-than-disclosed levels of nicotine delivery pose to a JUUL user. Instead, JUUL intentionally created a misleading impression that JUUL's products were intended for youth, were totally safe or at least safer than combustible cigarettes, and were not a nicotine delivery device but, rather, a trendy tech product that should be associated with products like the popular iPhone. The JUUL Enterprise violated the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 387b(8), 387k(a), as amended by the Tobacco Control Act, by advertising its e-cigarettes and nicotine juice as modified risk tobacco products without an appropriate FDA Order in effect, *i.e.*, widely disseminating misleading statements about the safety of JUUL products.

171. These deceptive acts were taken with the express intent of growing JUUL's market share and increasing JUUL's revenue, thereby causing financial gain to each of the JUUL Enterprise's members. In addition to enhancing the fortunes of its members, some of the increased revenues were used to operate and expand the JUUL Youth Marketing Enterprise.

172. Each member of the JUUL Enterprise was associated with an illegal enterprise and conspired, conducted, and participated in that enterprise's unlawful affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, in violation of 18 U.S.C. § 1341 (relating to mail fraud) and § 1343 (relating to wire fraud), all in violation of the RICO Act, 18 U.S.C. §§ 1962(a), (c)-(d). These acts, committed by interstate wire and through the mails, include: (1) sending and receiving thousands of statements over a number of years that contained deceptive statements regarding JUUL's e-cigarettes and JUULpods, the effects of nicotine use, the likelihood of becoming addicted to nicotine use, the design of JUUL's e-cigarettes, the amount of nicotine and other chemicals in JUULpods, and that JUUL's e-cigarettes were intended for use by adults who were already addicted to nicotine use rather than by new nicotine users; and (2) sending payments over that same time to further and guarantee the success of the deceptive acts described in (1).

173. The JUUL Enterprise falsely and misleadingly used the mails and wires in violation of 18 U.S.C. § 1341 and § 1342. Illustrative and non-exhaustive examples of this unlawful conduct include the following:

A. “Here at JUUL we are focused on driving innovation to eliminate cigarettes, with the corporate goal of improving the lives of the world’s one billion adult smokers.” (JUUL Twitter Feed, July 5, 2017);[196]

B. “JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world’s one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire.” (JUUL Website as of Oct. 7, 2019);[197]

C. “JUUL Labs exists to help adult smokers switch from combustible cigarettes.” (Ted Kwong, a company spokesman);[198]

D. “JUUL was designed with adult smokers in mind. . . . JUUL provides satisfaction to meet the standards of adult smokers looking to move away from smoking cigarettes.” (JUUL Website as of August 5, 2020);[199]

E. “Our Intent[:] . . . [W]e believe that vaping can have a positive impact when used by adult smokers, and can have a negative impact when used by nonsmokers. Our goal is to maximize the positive and reduce the negative.” (JUUL Website as of June 5, 2020);[200]

F. “We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences.” (JUUL Social Media Post, Mar. 14, 2018);[201]

G. “We don’t want anyone who doesn’t smoke, or already use nicotine, to use JUUL products. We certainly don’t want

[196] Jackler Testimony at 25 (noting that this was the first mention of the term “adult” or “adult smoker” on JUUL’s Twitter Feed).

[197] JUUL, *Our Mission*, https://web.archive.org/web/20191009012430/https://www.juul.com/mission-values.

[198] Joseph P. Williams, *Vaping: From ‘Safer Than Cigarettes’ to Public Health Crisis*, U.S. News and World Report (Sept. 30, 2019, 9:00 AM).

[199] JUUL, *Shop: Our Devices*, https://www.juul.com/shop/devices (last visited Aug. 5, 2020).

[200] JUUL, *Our Intent*, https://web.archive.org/web/20191009012430/https:/www.juul.com/mission-values.

[201] Jackler Testimony at 36.

youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. To paraphrase Commissioner Gottlieb, we want to be the off-ramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine. We won't be successful in our mission to serve adult smokers if we don't narrow the on-ramp. Our intent was never to have youth use JUUL products. But intent is not enough, the numbers are what matter, and the numbers tell us underage use of e-cigarette products is a problem. We must solve it." (Statement of Former CEO of JUUL, Ken Burns, posted on the JUUL website Nov. 13, 2018);[202]

H. "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers. We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (Statement of Howard Willard, Altria Chairman and Chief Executive Officer in Altria Press Release, Dec. 20, 2018);[203]

I. "First of all, I'd tell them that I'm sorry that their child's using the product . . . It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." (JUUL CEO Ken Burns, CNBC Interview, July 13, 2019);[204]

J. "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use Juul products. . . .That is a serious problem. Our company has no higher priority than combatting underage use." (Testimony of JUUL Founder James Monsees Before the House Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy, July 25, 2019);[205]

---

[202] Kevin Burns, *Juul Labs Action Plan*, https://newsroom.juul.com/juul-labs-action-plan/ (last visited Aug. 5, 2020).

[203] JUUL, *JUUL Statement About Altria Minority Investment and Service Agreements*, https://newsroom.juul.com/juul-statement-about-altria-minority-investment-and-service-agreements/ (last visited Aug. 5, 2020).

[204] Angelica LaVito, *As Juul grapples with teen vaping 'epidemic,' CEO tells parents 'I'm sorry'*, CNBC (July 13, 2019, 8:36 AM), https://www.cnbc.com/2019/07/13/as-juul-deals-with-teen-vaping-epidemic-ceo-tells-parents-im-sorry.html.

[205] *Examining JUUL's Role in the Youth Nicotine Epidemic: Part II, Hearing Before the Subcomm. on Econ. and Consumer Policy of the H. Comm. on Oversight and Reform*, 116th Cong. (2019) (statement of James Monsees, Co-founder and Chief Product Officer, JUUL Labs, Inc.), https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii.

K. "[W]e have no higher priority than combating youth use . . . we have taken a series of escalating steps to combat youth access, appeal, and use of vapor products " (JUUL statement in response to lawsuits, Aug. 29, 2019);[206]

L. James Monsees, one of the company's co-founders, said selling JUUL products to youth was "antithetical to the company's mission." (Quoted in New York Times article, *Did JUUL Lure Teenagers and Get 'Customers for Life'?*, Aug. 27, 2018);[207]

M. "Our focus is and will remain entirely on helping adult smokers switch away from combustible cigarettes, the leading cause of preventable death in the world." (Joshua Raffel, JUUL spokesperson, quoted in New York Times article, *Philip Morris and Altria Are in Talks to Merge*, Aug. 27, 2019);[208] and

N. "We have never marketed to youth and we never will." (JUUL statement quoted in Los Angeles Times article, *Studies show how Juul exploited social media to get teens to start vaping*, Sept. 24, 2019).[209]

174. Defendants intended for the public and regulators to rely on these false transmissions and this scheme was therefore reasonably calculated to deceive persons of ordinary prudence and comprehension.

175. Both the public and government regulators did rely on the JUUL Enterprise's mail and wire fraud. For example, the regulators, including the FDA, relied on the JUUL Enterprise's statements that it did not market to youth in allowing the RICO Defendants to continue marketing and selling JUUL. The public relied on statements (or absence thereof) that were transmitted by the Defendants regarding the nicotine content in and potency of JUUL pods in deciding to purchase JUUL products and relied on statements denying past youth marketing in not creating a public outcry forcing these products to be removed from the market.

---

[206] JUUL, *Our Actions to Combat Underage Use*, (Aug. 29, 2019), https://www.juullabs.com/our-actions-to-combat-underage-use/ (last visited Aug. 5, 2020).

[207] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?* N.Y. Times (Aug. 27, 2019), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[208] Sheila Kaplan, *Philip Morris and Altria Are in Talks to Merge*, N.Y. Times (Aug. 27, 2019), https://www.nytimes.com/2019/08/27/health/philip-morris-altria-merger-tobacco.html.

[209] Michael Hiltzik, *Studies show how Juul exploited social media to get teens to start vaping*, Los Angeles Times (Sept. 24, 2019), https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens.

176. These were not isolated incidents, instead, Defendants engaged in a pattern of racketeering activity by committing thousands of predicate acts in a five-year period in the form of mail and wire fraud. That each Defendant participated in a variety of schemes involving thousands of predicate acts of mail and wire fraud establishes that such fraudulent acts are part of the Enterprise's regular way of doing business. Moreover, the Yurok Tribe expects to uncover even more coordinated, predicate acts of fraud as discovery in this case continues.

177. Each member of the JUUL Enterprise profited from the Enterprise, and the Yurok Tribe suffered injury to its property because it has incurred substantial expense, is incurring substantial expense, and will continue to incur substantial expense in mitigating and combatting the harmful effects resulting from JUUL use by Yurok Tribe members, including increased security and monitoring protocols, disciplinary programs, and educational programs necessary to correct JUUL Enterprise's deceptive and illegal marketing. The members of the JUUL Enterprise used the proceeds from their deceptive acts to further the scheme by, among other things, expanding the depth and breadth of the deceptive marketing. For example, JUUL began offering to sponsor purportedly education-related activities under the guise of preventing underage use of e-cigarettes. In reality, JUUL sought to raise awareness of its products and gain additional users. The members of the JUUL Enterprise conspired to deceive the Yurok Tribe and its members.

178. The JUUL Enterprise has existed since at least 2015. It has functioned as a continuing entity and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity. Each member's participation in the JUUL Enterprise is necessary for the successful operation of the deceptive marketing scheme and the financial gains that resulted therefrom.

179. The Altria Defendants became part of the JUUL Enterprise by, at the latest, December 20, 2018, when it purchased a 35% stake in JUUL. When the Altria Defendants joined the JUUL Enterprise, it shared the common purpose of maintaining and expanding the number of nicotine-addicted e-vapor users in order to ensure a steady and growing customer base. The Altria Defendants are liable for the predicate acts of the enterprise committed no later than when it joined the JUUL Enterprise.

180. As described above, Defendants established an ongoing relationship through, among other connections, Defendants' Priztker, Huh, and Valani's investment in JUUL; Defendants' Bowen, Monsees, Pritzker, Huh, and Valani's control of the JUUL Board of Directors; and Defendants' decisions regarding marketing for JUUL products, including fraudulent advertising. The Altria Defendants established an ongoing relationship with the other Defendants through, among other connections, Altria's equity investment in JUUL, and the many informal and formal agreements between the Defendants and their coordinated activities in furtherance of the common purpose of the JUUL Enterprise.

181. The Yurok Tribe has sustained injury by reason of the acts and conduct of Defendants alleged in this Complaint, including but not limited to the Yurok Tribe's loss of money in funding mitigation and remedial programs regarding JUUL use by youth which, but for the deceptive marketing and other acts of the JUUL Enterprise, it would not have incurred.

182. The Yurok Tribe was the direct target of Defendants' scheme.

183. But for the conduct of Defendants alleged herein, the Yurok Tribe would not have suffered the injuries alleged in this Complaint. These injuries suffered by the Yurok Tribe were a foreseeable and natural consequence of the scheme to defraud. The injuries of the Yurok Tribe were directly and proximately caused by Defendants' racketeering activity that deceived and defrauded consumers and resulted in a meteoric rise of tribal youth-vaping.

184. As a result and by reason of the foregoing, the Yurok Tribe has been injured, suffered harm and sustained damage to its business and property, and is therefore entitled to recover actual and treble damages, and its costs of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

185. Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the members of the JUUL Enterprise agreed to conspire and conspired to violate 18 U.S.C. § 1962(c), as described herein. The conspiracy is coterminous with the time period in which the JUUL Enterprise has existed. Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise in furtherance of a common purpose,

as detailed above in relation to the Defendants' substantive violation of Section 1962(c). Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants have participated as co-conspirators with the members of the JUUL Enterprise in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue, maintain or increase market share, and/or minimize losses for the Defendants and their named and unnamed co-conspirators throughout the illegal scheme and common course of conduct.

186. Plaintiff has been injured by the JUUL Enterprise, and such injury would not have occurred but for the predicate acts of Defendants that also constitute the acts taken by Defendants in furtherance of their conspiracy pursuant to Section 1962(d). The combined effect of Defendants' acts of mail and wire fraud in furtherance of their conspiracy, including working to preserve and expand the market of underage JUUL customers, fraudulently denying JUUL's youth-focused marketing, and deceiving regulators and the public in order to allow JUUL products to remain on the market, was to cause the expansion of an illicit e-cigarette market for youth and cause a large number of people to become addicted to nicotine, thus forcing the Yurok Tribe to expend time, money, and resources to address the epidemic Defendants created through their conduct. Indeed, Defendants intentionally sought to deceive public health officials in order to continue growing JUUL's customer base. The harm to the Yurok Tribe would not have occurred absent the Defendants' conspiracy to engage in a pattern of racketeering activity through a RICO enterprise.

187. There are no intervening acts or parties that could interrupt the causal chain between Defendants' mail and wire fraud acts in furtherance of their RICO conspiracy and the Yurok Tribe's injuries.

188. As to predicate acts undertaken in furtherance of the conspiracy which occurred prior to five years from the date of this Complaint, Plaintiff did not discover those acts, and could not have been aware of them despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation.

189. As set forth above, Defendants have violated 18 U.S.C. §§ 1962(c), and (d), and will continue to do so in the future unless a court enjoins them from doing so.

190. Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity and disgorging ill-gotten gains is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to issue appropriate orders to provide equitable relief to the Yurok Tribe and enjoin violations of 18 U.S.C. § 1962.

191. The Yurok Tribe seeks compensatory damages, disgorgement, equitable relief, injunctive relief, treble damages, and attorneys' fees.

**COUNT II – VIOLATION OF CALIFORNIA PUBLIC NUISANCE LAW**

192. The Yurok Tribe hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

193. The Yurok Tribe brings this public nuisance claim under California law as to all Defendants. Under California law, a public nuisance is a "substantial and unreasonable" interference with collective social interests. *Cnty. of Santa Clara v. Atlantic Richfield Co.*, 40 Cal. Rptr. 3d 313, 325 (Cal. Ct. Apjjp. 2006) (citation omitted). A public nuisance is "substantial if it causes significant harm and unreasonable if its social utility is outweighed by the gravity of the harm inflicted." *Id.*

194. The Yurok Tribe has the power and authority to take action for abatement or removal of a public nuisance as its public health, safety or welfare may require.

195. Defendants, through the actions described in this Complaint, have created and maintained or were a substantial factor in creating and maintaining a public nuisance by substantially and unreasonably interfering with a right that is common to the general public and that harms the health, safety, peace, comfort, or convenience of the general community.

196. Defendants' design, marketing, and distribution of their products to minors and their conduct of specifically targeting Native Americans, who are more susceptible to nicotine addiction than non-Native Americans, caused or assisted in causing the public nuisance of the vaping epidemic in the Yurok Tribe's community, as well as the adverse social, economic, and human health outcomes associated with the widespread nicotine epidemic.

197. Defendants had knowledge that their conduct would increase or would assist in increasing addiction, and specifically Native American addiction, to nicotine.

198. Defendants' design, manufacture, production, marketing, distribution, and sale of highly-addictive and harmful e-cigarettes and nicotine pods, when such actions were taken with the intent to market and, in fact, were marketed to youth through repeated misstatements and omissions of material fact, substantially and unreasonably interfered with a public right in that the results of Defendants' actions created and maintained a condition dangerous to the public's health, was offensive to Yurok Tribe's community moral standard, or unlawfully obstructed the public in free use of the Yurok Tribe's public property. Defendants intentionally created and maintained a public nuisance by, among other acts: (a) actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, extensively targeting youth through social media campaigns, and recruiting "influencers" to market to teens; (b) engaging in marketing tactics specifically designed to mislead children and youth and to ensnare minors into nicotine addiction, including by explicitly adopting tactics prohibited from Big Tobacco, with the knowledge that those tactics were likely to ensnare children and youth into nicotine addiction, including using billboards and outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push JUUL products on JUUL's behalf, and by selling JUUL in flavors designed to appeal to youth; (c) engaging in advertising modeled on cigarette ads and featuring youthful-appearing models and designing advertising in a patently youth-oriented fashion; (d) directing advertising to youth media outlets and media designed to appeal to children and youth, such as Instagram and other social media channels; (e) hosting youth-focused parties across the United States, at which free JUUL samples were dispensed and in which vaping was featured prominently across JUUL-sponsored social media; (f) formulating JUULpods with flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon JUUL products; (g) promoting and assisting the growth of the JUUL market and its availability with knowledge that JUUL products were being purchased and used by large numbers of youth; and (h) targeting Native American youth,

knowing that Native Americans fight high rates of addiction to substances such as nicotine due to historic and ongoing trauma in their communities.

199. Defendants' conduct has been continuous and has occurred over a span of years and is ongoing. Defendants' conduct has affected and continues to affect a substantial number of people within the Yurok Tribe and is likely to continue causing significant harm.

200. But for Defendants' actions, JUUL and other e-cigarette use would not be as widespread as it is today, and the vaping public health epidemic that currently exists as a result of the Defendants' conduct would have been averted.

201. The Yurok Tribe has a right to be free from substantial injury to the public health, safety, peace, comfort, or convenience that has resulted from Defendants' wrongful conduct.

202. The Yurok Tribe has a right to educate its children in a safe, healthy, peaceful, comfortable, and convenient setting.

203. The health and safety of the Yurok Tribe members who use, have used, or will use JUUL products, as well as Yurok Tribe members affected by others' use of JUUL products, are matters of substantial public interest and of legitimate concern to the Yurok Tribe.

204. The significant time and resources necessary for the Yurok Tribe to combat the epidemic, maintain the safety of its members, and achieve its educational goals are harms that are unique from the harm suffered by the general public.

205. The particular harms suffered by the Yurok Tribe, as a sovereign tribal government, are different than those suffered by the community at large, both in kind and quality. The Yurok Tribe has incurred and will continue to incur significant expenditures of time and resources to combat rampant use of Defendants' nicotine products by its members. The true scope and nature of the harm and the extent of resources that are going to be required to abate the harm continues to evolve as the epidemic still exists and best practices to combat it are still being developed.

206. The Yurok Tribe has been constrained in the action it has been able to take given budgetary and resource constraints. Expenditures past and future required as a direct result of the public nuisance include, but are not limited to: (a) time and resources spent collecting and

analyzing data regarding vaping and factors associated with vaping; (b) time and resources spent obtaining and considering medical and scientific literature; (c) time and resources spent educating persons on the effects of vaping; (d) time and resources for investigating vape-related incidents; (e) time and resources associated with changing health curricula to include dangers regarding vaping; (f) time and resources associated with changing codes of conduct, rules and disciplinary methods; (g) costs associated with signage or printed materials regarding vaping; (h) time and resources spent on group and individual counseling and meetings on vaping and its effects; (i) time and resources spent on prevention; and (j) time and resources to establish cessation programming on vaping.

207. Defendants' unfair and deceptive conduct has caused the damage and harm described in this Complaint. Defendants knew or reasonably should have known that their statements regarding the risks and benefits of JUUL were false and misleading, that their marketing methods were designed to appeal to minors that their products would be particularly addictive and harmful to children, that Native American children were particularly susceptible to addictive substances, including specifically nicotine, and that their false and misleading statements, marketing to minors, and active efforts to increase the accessibility of JUUL products and grow JUUL's market share were causing harm to minors, including minors in the Yurok Tribe. Thus, the public nuisance caused by Defendants was reasonably foreseeable, including the economic losses incurred by the Yurok Tribe.

208. Alternatively, Defendants' conduct was a proximate cause in bringing about the public nuisance. By directly marketing to youth and continuing marketing practices after it was evident that children were using JUUL products in large numbers and were specifically using these products in school, JUUL directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting the Tribe. By investing billions of dollars in JUUL and actively working to promote the sale and spread of JUUL products with knowledge of the JUUL practice of marketing its products to youth as well as its failure to control youth access to its products, Altria directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting the Yurok Tribe.

209. The public nuisance created and maintained by Defendants has resulted, and continues to result, in significant damage and annoyance to the Yurok Tribe. Again, the FDA and others have recognized that teen vaping is an epidemic and that Defendants' actions are at the heart of that epidemic.

**COUNT III – NEGLIGENCE**

210. The Yurok Tribe hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

211. The Yurok Tribe brings this negligence claim under California law as to all Defendants. Under California law, the elements of a negligence claim are: (1) a legal duty of care, (2) breach of that duty, and (3) proximate cause resulting in injury. *Staats v. Vintner's Golf Club, LLC*, 236 Cal. Rptr. 3d 236, 240 (Cal. Ct. App. 2018) (citation omitted).

212. Defendants owed the Yurok Tribe a duty to not expose the Yurok Tribe to an unreasonable risk of harm.

213. At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply promotion, packaging, sale, and distribution of its JUUL products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

214. At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of its JUUL products. Defendants' duty of care owed to consumers and the general public, including the Yurok Tribe, included providing accurate, true, and correct information concerning the risks of using JUUL products and appropriate, complete, and accurate warnings concerning the potential adverse effects of vaping and nicotine use and, in particular, JUUL's patented nicotine salts and the chemical makeup of JUULpods liquids.

215. At all times relevant to this litigation, Defendants knew, or in the exercise of reasonable care should have known, of the hazards and dangers of JUUL products and specifically, the health hazards posed by vaping JUULpods and continued use of nicotine. Given

the widespread and mainstream public health message of the significant illnesses and fatalities caused by the use of tobacco and nicotine; the enactment of the Family Smoking Prevention and Tobacco Control Act of 2009, designed in part to reduce smoking rates among adolescents; and Defendants' prominent presence in the tobacco industry; Defendants actually knew or had significant reason to know of the hazards and dangers of JUUL products.

216. Accordingly, at all times relevant to this litigation, Defendants knew, or in the exercise of reasonable care should have known, that use of JUUL e-cigarettes and JUULpods, especially Native American children, could cause the Yurok Tribe's injuries and thus would create a dangerous and unreasonable risk of injury to the Yurok Tribe.

217. Defendants also knew, or in the exercise of reasonable care should have known, that users and consumers of JUUL products were unaware of the risks and the magnitude of the risks associated with the use of JUUL products including but not limited to the risk of continued nicotine use and nicotine addiction.

218. As such, Defendants' breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their JUUL e-cigarettes and JUULpods, in that Defendants manufactured and produced defective products containing nicotine and other chemicals known to cause harm to consumers, and failed to prevent or adequately warn of these risks and injuries.

219. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendants have failed to do so. In fact, the Defendants did just the opposite. The Defendants plotted, schemed, and investigated a marketing strategy designed to attract children to use the highly addictive product, especially Native American children. Moreover, Defendants have wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or use of JUUL products and nicotine vaping.

220. Defendants' negligence also included: (a) manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its JUUL products without thorough and adequate pre- and post-market testing; (b) failing to undertake sufficient studies and

to conduct necessary tests to determine whether or not JUUL products were safe for their intended use; (c) failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of JUUL products so as to avoid the risk of serious harm associated with the prevalent use of JUUL products and nicotine; (d) failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use its JUUL products; (e) failing to disclose to the Yurok Tribe, users, consumers, and the general public that the use of JUUL products presented severe health risks including nicotine addiction; (f) misrepresenting that its JUUL products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use; (g) declining to make or propose any changes to JUUL products' labeling or other promotional materials that would alert the consumers and the general public of the true risks of JUUL products; (h) advertising, marketing, and recommending the use of JUUL products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of JUUL products; (i) continuing to disseminate information to its consumers, which indicates or implies that Defendants' products are not unsafe for their intended use; and (j) continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

221. Defendants knew and/or should have known that it was foreseeable that the Yurok Tribe would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of JUUL products.

222. The Yurok Tribe did not know the nature and extent of the injuries that could result from the intended use of JUUL products or JUUL's patented JUULpods liquids by Yurok Tribe members.

223. Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that the Yurok Tribe suffered, and will continue to suffer, as described in this Complaint.

## VI. <u>REQUEST FOR PUNITIVE DAMAGES</u>

224. The Yurok Tribe hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

225. California law provides for punitive damages where the defendant has acted with “fraud, or malice,” express or implied, which must be proven with clear and convincing evidence. Cal. Civil Code § 3294(a). The requisite intent to support punitive damages is malice, and it “may be proved ‘either expressly (by direct evidence probative on the existence of hatred or ill will) or by implication (by indirect evidence from which the jury may draw inferences.’” *Neal v. Farmers Ins. Exch.*, 582 P.2d 980, 987 n.6 (1978) (citation omitted).

226. Defendants’ corporate acts described herein showed a reckless and wanton disregard of the rights of the Yurok Tribe and are beyond human decency.

227. Defendants’ corporate acts demonstrated malice by showing bad motive, ill will, or reckless disregard toward the Yurok Tribe and, in particular, to its young members.

228. Defendants’ deliberate and outrageous corporate acts were aimed at securing financial gain at the expense of the Yurok Tribe and, in particular, its young members.

229. A motivation behind Defendants’ corporate acts was to place its desire and greed for profits ahead of the well-being and safety of the Yurok Tribe and, in particular, its young members.

230. Defendants’ corporate acts were outrageously reprehensible.

231. Defendants’ corporate acts have the character of outrage frequently associated with crime.

232. Defendants intentionally targeted the Yurok Tribe’s young members when they knew that their brains were not fully developed, that they were particularly vulnerable, and that they were more susceptible to marketing and more easily addicted to nicotine than adults.

233. Defendants intentionally marketed to the Yurok Tribe’s young members when they knew that nicotine was especially harmful to children’s developing brains.

234. Defendants knowingly and intentionally sold JUULpods to minors through the use of an internet sales platform and allowed internet websites to sell to minors without controls on whether purchasers were of the legal age to purchase.

235. Defendants knew that children under the age of 18, including the Yurok Tribe's young members, were obtaining and using their products at disturbing levels, yet failed to act in a timely manner to stop the illegal diversion of its products.

236. Defendants knew that there was a high risk of substantial harms to the Yurok Tribe members, but deliberately proceeded to act and failed to act in conscious disregard of those risks.

237. Defendants knew that it was not legal to target minors and intentionally did so anyway for purposes of maximizing profit.

238. Defendants knew JUUL's products were the types of products that could endanger children if negligently made, promoted, or distributed. Defendants knew the risks that young people would be attracted to their e-cigarettes and JUULpods and knew the importance of ensuring that the products were not sold and/or distributed to anyone under age 26, but especially to minors.

239. Defendants knew that their marketing, distribution, and sales practices did not adequately safeguard minors from the sale and distribution of e-cigarette devices and JUULpods and, in fact, induced minors to purchase JUUL products.

240. As a powerfully addictive and dangerous nicotine-delivery device, Defendants knew JUUL's products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold, supplied and distributed properly, and without defects to avoid needlessly causing harm. Defendants knew that their products could cause serious risk of harm, particularly to the Yurok Tribe's young members.

241. Defendants failed to perform adequate testing of the JUUL products prior to marketing to ensure safety, including long-term testing and research of the product and testing for injury to the brain and cardiovascular systems, and other related medical conditions.

242. Defendants promoted JUUL's products to young people under age 26 and especially to minors, despite knowing that it was unsafe for minors.

243. Defendants used flavors and design to appeal to young people under age 26 and especially to minors.

244. Defendants designed the products to smell good, look cool, and easy to conceal from adults.

245. Defendants were aware of social media on the internet encouraging the use of JUUL, explaining how to use JUUL, explaining how to conceal JUUL, and suggesting products created by others to facilitate concealing JUUL.

246. Defendants knew of products designed to help conceal JUUL, including hoodies and backpacks.

247. Defendant used design that maximizes nicotine delivery while minimizing “throat hit” thereby easily creating and sustaining addiction and causing deep inhalation into the child’s lungs.

248. Defendants failed to prevent JUUL’s products from being sold to young people under age 26, particularly to minors.

249. Defendants failed to prevent use of JUUL’s products among young people under age 26, particularly for minors.

250. Defendants failed to curb use of JUUL’s products among young people under age 26, particularly for minors.

251. Defendants failed to develop tools or support to help people addicted to JUUL’s products cease using the products, including manufacturing lesser amounts of nicotine.

252. Defendants failed to reasonably and properly test and properly analyze the testing of JUUL’s products under reasonably foreseeable circumstances.

253. Defendants failed to warn its customers about the dangers associated with use of JUUL’s products, in that it was unsafe for anyone under age 26; significantly increases blood pressure; carries risks of stroke, heart attacks, and cardiovascular events; is powerfully addictive especially in Native Americans; causes damages to the lungs; increases the risk of respiratory failure; and can cause permanent brain changes, mood disorders, and impairment of thinking and cognition.

254. Defendants failed to instruct customers not to use the product if they were under 26, particularly minors and Native Americans, and failed to provide any instructions regarding a safe amount of JUULpods to consume in a day.

255. Defendants failed to ensure that JUUL's products would not be used by persons like Yurok Tribe's young members who were not smokers.

256. Defendants failed to warn customers that JUUL had not adequately tested or researched JUUL products prior to marketing to ensure safety, including long-term testing of the product and testing for injury to the brain, lungs, and cardiovascular systems; susceptibility to respiratory viruses and bacteria; and other related medical conditions.

257. Defendants failed to utilize proper materials and components in the design of JUUL's products to ensure they would not deliver unsafe doses of nicotine in unsafe pathways to the lungs.

258. Defendants failed to take necessary steps to modify JUUL's products to avoid delivering high doses of nicotine to children and repeatedly exposing them to toxic chemicals.

259. Defendants failed to recall JUUL's products.

260. Defendants failed to inspect JUUL's products for them to operate properly and avoid delivering unsafe levels of nicotine to young person.

261. Defendants were either (a) intentionally knowing of the susceptibility of Native Americans to nicotine addiction and other addictive substances, or (b) grossly negligently making themselves unaware of said susceptibility and directly targeting and marketing to Native American children and minors. Defendants thus engaged in reprehensible conduct either intentionally calculated to harm Native Americans, or in total and utter disregard for the health of Native Americans, including the York Tribe's members.

262. A responsible company whose claimed primary purpose was to help adult smokers would not design a product to appeal to minors and nonsmokers nor market their products to minors and nonsmokers. If they were aware of the dangers of smoking and nicotine ingestion enough to create a device ostensibly designed to help people stop smoking, then Defendants

should also have been aware of the dangers to know that it would be harmful for young people, children, Native Americans, and/or nonsmokers to use.

263. Responsible management personnel within the Defendants' corporations had actual knowledge of wrongdoing on the part of lower-level employees or were involved in the wrongful acts themselves.

264. The governing officers and leadership representatives of Defendants directed, participated, and ratified the wrongful acts of corporate agents of Defendants herein described.

265. As a foreseeable consequence of Defendants' aforementioned conduct, the Yurok Tribe suffered direct and consequential economic injuries as described in this Complaint as a result of dealing with the JUUL epidemic within the Yurok Tribe.

266. The Yurok Tribe is therefore entitled payment of punitive damages from Defendants meant to punish them, deter their future conduct, and to send a message to the community at large that the Defendants' outrageous conduct will not be tolerated.

## VII. PRAYER FOR RELIEF

WHEREFORE, the Yurok Tribe prays to the Court and/or jury for judgment from and against the Defendants, jointly and severally, as follows:

1. Entering an Order that Defendants are jointly and severally liable;
2. Entering an Order that Defendants' conduct as alleged herein constitutes a violation of RICO and entitles the Yurok Tribe to compensatory damages, disgorgement, equitable relief, injunctive relief, treble damages, and attorneys' fees;
3. Entering an Order that Defendants' conduct as alleged herein constitutes a public nuisance under applicable law;
4. Entering an Order that Defendants shall be required to abate and remediate the public nuisance described herein;
5. Entering an Order that Defendants were negligent and that said negligence caused the harm and damages herein alleged and to be proven at trial;
6. Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

7. Awarding the Yurok Tribe equitable relief to fund prevention education and addiction treatment, as well as to abate the nuisance;

8. Entering an Order that Defendants engaged in a civil conspiracy to commit and promote the wrongful conduct herein alleged;

9. Awarding the Yurok Tribe actual and compensatory damages as determined by the trier of fact;

10. Awarding the Yurok Tribe punitive damages as determined by the trier of fact;

11. Awarding the Yurok Tribe statutory damages in the maximum amount permitted by law;

12. Awarding reasonable attorneys' fees and the costs and expenses of this civil action and lawsuit;

13. Awarding pre-judgment and post-judgment interest; and

14. Such other and further relief as the Court and/or jury deems just and proper under the circumstances.

## VIII. JURY TRIAL DEMANDED

The Yurok Tribe hereby demands a trial by jury.

Dated: August 6, 2020

Respectfully submitted,

By: ___/s/ *Dan Drachler*___________

Dan Drachler (*pro hac vice* forthcoming)
Sona R. Shah (*pro hac vice* forthcoming)
Henry Avery (*pro hac vice* forthcoming)
**ZWERLING, SCHACHTER & ZWERLING, LLP**
1904 Third Avenue, Suite 1030
Seattle, WA 98101
Tel: (206) 223-2053
Fax: (206) 343-9636
ddrachler@zsz.com
sshah@zsz.com
havery@zsz.com

-and-

41 Madison Avenue, 32nd Floor
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

By: ___/s/ *Eric B. Fastiff*___________
Elizabeth J. Cabraser (State Bar No. 083151)
Sarah R. London (State Bar No. 267083)
Eric B. Fastiff (State Bar No. 182260)
Reilly T. Stoler (State Bar No. 310761)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
slondon@lchb.com
efastiff@lchb.com
rstoler@lchb.com